696 So.2d 22 (1997)
STATE of Louisiana
v.
Robert POOLER.
No. 96 KA 1794.
Court of Appeal of Louisiana, First Circuit.
May 9, 1997.
*29 Charlotte Hebert, Livingston, for State Appellee.
Lloyd S. Sibley, Holden, for Defendant Appellant.
Before LOTTINGER, C.J., and FOIL and FOGG, JJ.
FOGG, Judge.
The defendant, Robert Pooler, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. The defendant pled not guilty, was tried by a jury, and was convicted as charged. The trial court sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant has appealed, asserting thirty-two assignments of error.[1]

FACTS
The pertinent testimony from trial was as follows. Delphine Willis, the victim's mother, testified that the victim, Lois Ann Willis, lived in a house on the same property where she and her husband lived in Springfield, Louisiana, and that the victim ran a lounge, beauty shop, and pawn business on the property. Mrs. Willis saw the victim in the morning on March 30, 1993. That night, Mrs. Willis heard the victim slam the door to her bar very hard, a sign that she had closed the bar and was going home. Shortly afterward, at around 1:00 a.m., Mrs. Willis heard the dogs in her yard barking and went outside with a gun, which she shot into the air. Not hearing anything more, she went back inside. On March 31, 1993, Mrs. Willis did not see the victim in the morning; so she went to check on her around 1:30 or 2:00 p.m. She found the victim lying in bed, without any clothes on, "cut to death." She informed her husband, and he called the police. Mrs. Willis identified the defendant in court and testified he was not welcome at any of her children's houses, including that of the victim.
Deborah Prokop testified that, sometime in the afternoon of March 30, 1993, she picked up her ex-husband, Eddie Prokop, at his trailer in Springfield to get some rock cocaine. They went to the victim's bar to pick up a microwave oven Eddie had pawned. Deborah testified that her car had no clock or radio, nor did she or Eddie have a watch, but it was "probably just getting dark" the first time they went to the victim's bar. They returned to the victim's bar twice more to buy back a pawned item and to pawn another item. Then they went to Haynes Settlement, an area in Springfield about ten minutes away from the victim's bar, where Deborah saw the defendant, whom she knew, in front of his mother's and brother's trailer; he approached them, wanting a ride. Deborah refused, telling him they did not have much gas. According to Deborah, the defendant told them he would get them a dime rock for gas money if they would give him a ride. Deborah testified that the defendant appeared to be somewhat intoxicated and that she did not want to give him a ride because she had always "been intimidated" *30 by the defendant. The defendant got into an argument with her and Eddie.
They left and eventually went back to the victim's bar to pawn something; Deborah pulled up in the driveway and parked. Eddie got out of the car and went to the door, which was locked. He walked around to the back of the building. Once she had stopped the car, Deborah noticed that the dogs were barking "real bad." She then saw a figure of a person "trying to hide itself." The figure ran towards and then past the car, and Deborah saw that the person was a black man of medium build who was taller than her. When Eddie returned to the car, she told him what she had seen and then they left.
Michael Friarson testified that he had known the defendant his entire life. He testified that he saw him twice, at about 9:30 p.m. on March 30, 1993, and at 12:30 a.m. on March 31, 1993, in Haynes Settlement. According to Friarson, at 12:30 the defendant told him he was waiting for a ride. Friarson said that he saw the defendant walk to his house about a block from where they were. Friarson testified that the defendant was a little drunk, that he was not wearing a watch or jewelry, and that he had on a white shirt, black pants, and black rubber boots.
Juanita Harris, who had known the defendant all her life and whose parents lived next door to the defendant's parents, testified that on March 31, 1993, she was awakened around 12:00 a.m. when the defendant knocked on her door. The defendant told her that her brother Danny, with whom he was friends, was in her driveway drunk and needed her help. The defendant told her to get the keys to her car so she could drive it to the end of her driveway and he could take Danny home. She called her mother and father for help with her brother, and they said he was at home in bed; her father came to her house about five minutes later. According to Harris, the defendant ran through the woods when her father drove up. Harris testified that her brother actually was home asleep in bed when the defendant came to her house.
Jamie Bridges, who testified he had known the defendant and the victim and went to the victim's bar frequently, saw the defendant before learning of the victim's murder. Bridges noticed the defendant was wearing a men's chrome watch with gold striping on the band and a black face. Bridges had seen one like it on the victim's arm and had asked her repeatedly if she wanted to sell it. Bridges asked the defendant if he could buy the watch. According to Bridges, the defendant said "he was going to keep it in memory of Lois Ann," then grinned and walked off.
Danny Jackson, Harris' brother, who had also known the defendant since childhood and was friends with him, and who also knew the victim, testified that on March 30, 1993, he spent most of the day drinking with the defendant. According to Jackson, the defendant and the defendant's brother Terry had a confrontation at about 8:00 p.m. The defendant told Terry that "he would kill him and think nothing of it." The defendant made a motion with his hand and said that "he would cut his throat and think nothing of it." Jackson left the defendant, went to someone else's house, and then returned home and went to bed.
While in bed, Jackson heard the phone ring; and his mother came to his bedroom door, which was cracked. The next morning around 9:00 or 9:30 a.m., Jackson saw the defendant pacing in the road, which seemed abnormal. The defendant said "he fed up big time last night." The defendant said that he had been up all night and needed a good stiff drink. Jackson repeatedly asked the defendant what had happened, but the defendant would not say. They went to someone named Glenn's house, and the defendant sold Glenn some necklaces. The defendant and Jackson then went to the store at the Mobil station in Springfield to get drinks. Jackson testified that a bill in the money the defendant used "had a couple of spots of little blood on it." Later that day, Jackson, Glenn, and the defendant walked toward the defendant's parents' house, where Detectives Kearney Foster and Dillard Stewart were. Jackson testified the defendant said that "he killed her, but they can't prove it."
Lawrence Willis, Jr., the victim's brother, lived across from the victim and saw her the *31 night before she was killed when he visited her at her bar at about 10:00 p.m. When Willis left at 11:45 or 11:55 p.m. to go home, he was the only person with the victim in the bar. He went to bed and was awakened by the dogs barking later that night, but he could not tell what time it was. Willis testified that the victim had a men's watch with a black face with diamonds and a two-tone gold and silver band, which she wore all the time and had on that night. According to Willis, the victim's watch was missing after she was murdered. He testified that, when he left the bar, the victim's hair was down with a bow in it.
Kearney Foster, chief of detectives with the Livingston Parish Sheriff's Office, went to the victim's house the day the body was discovered to investigate the crime. Det. Foster testified that the victim had mud on her feet and the bed had mud on it, but there was no mud in the victim's yard. The detectives found a folding blade knife in the clothes at the foot of the victim's bed. He and the other detectives thought they saw blood on the grass 10 feet from the victim's house, and he asked someone to call the local hospitals to find anyone who might have had a knife injury. (They later learned the substance was not blood.)
Det. Foster learned that a person named William Parker went to the hospital with a stab wound. He and Detective Stewart went to talk to the defendant to see if the defendant knew Parker since the defendant used to go with the victim for a number of years before they broke up. When they arrived at the defendant's house, his family was outside; and then the defendant walked up. The defendant's mother told the detectives that the defendant came home the night before at 10:30 p.m. and slept all night. The defendant was asked who Parker was, and he did not know; because everyone was talking at once, Det. Foster asked the defendant to take a ride with him and Det. Stewart.
The defendant voluntarily got in the car and told the detectives he knew he was a suspect and had nothing to hide. Det. Foster asked the defendant if he had any cuts or scratches, and the defendant replied that he had a cut on his hand. He showed them his left hand, which had two cuts; and they read him his rights. The defendant said he got the cuts hauling tin from Paul Denham. The detectives asked the defendant if the clothes he had on were the ones he had worn the previous night. He told them they were not, that he was wearing blue jeans with white spots the night before; he later told them the jeans were black. The defendant said they could look at the clothes he had worn.
They returned to the defendant's parents' house and the defendant's mother told Det. Stewart that the defendant had the pants on which he had worn. However, the defendant told her the pants were in the house; Det. Stewart went into the house and came out with some black jeans with white spots and mud on them. The defendant definitively identified the black jeans as the pants he had worn the night before. The defendant said the mud got on his pants while he was digging a ditch for someone in Hungarian Settlement on Monday, March 29, 1993.
The detectives let the defendant out of the car, and the defendant's brother Terry stopped to talk to them. Terry got in the car and said he had information about the defendant and a murder, but needed money; Det. Foster gave him $20. He told them that the defendant killed the victim, that the defendant was selling jewelry, and that the defendant spent bloody money at the Mobil Mart in Springfield. The detectives drove to a well-lit car wash to examine the pants; they saw mud and blood on them. They then went to the Mobil Mart and got the store's money, but none had blood on it. Det. Foster testified that the defendant probably had been there at noon, and they got there between 7:00 and 8:00 p.m.
Det. Foster testified that they arrested the defendant for misdemeanor theft the next day. During cross-examination, Det. Foster explained that these criminal charges against the defendant were based on Eddie Prokop's allegation that the defendant stole his radio and knife the day before the victim was killed. They executed a search warrant on the defendant's parents' house and found a butcher knife under the mattress of his sister's bed.
*32 Det. Foster testified that he had delivered a message to the defendant two weeks before the murder. Det. Foster told him not to go to the victim's or her mother's again. According to Det. Foster, the defendant had gone to their property to pick up a tiller and they got into an argument. Det. Foster told the defendant the women were scared of him and would shoot him. The defendant talked to Det. Foster about the charges that the victim had filed against him. The defendant's lawyer had told him she thought the charges would be thrown out, and Det. Foster agreed. Det. Foster testified that, while discussing the charges, the defendant became upset and said the victim "had did him wrong."
Det. Foster said they later learned that William Parker was stabbed by his wife. Det. Foster also questioned Eddie Prokop because he was in the area the night the victim was murdered and he regularly pawned items through the victim. They took Eddie's pants, boots, and shoes, and also did a polygraph. They did not do a blood test. Eddie's car had no mud in it; the detectives found a knife in the car, but it was later determined that it had no blood on it.
On cross-examination, Det. Foster was asked whether they had investigated Riley Jones as a suspect in the victim's murder. Det. Foster then explained that years ago he charged the victim with killing Jones' daughter, who was also the victim's niece. During a fight between the victim and Jones, the victim pulled a gun and fired three shots, one of which killed Jones' daughter. Det. Foster explained that the victim turned herself in and that the charges were reduced to negligent homicide. On cross-examination, the defense counsel asked Det. Foster if he was familiar with the victim's allegation that the defendant raped and beat her and that a trial was held on those charges at which the jury found the defendant not guilty. Counsel also questioned Det. Foster about the recharging of defendant with second degree battery not long after the trial was held. Det. Foster was familiar with what had happened.
Det. Dillard Stewart, a detective with the Livingston Parish Sheriff's Office, testified that he went with Det. Foster to the defendant's home on March 31, 1993, trying to find out if the defendant knew Parker. He corroborated Det. Foster's testimony about the crowd of people at the defendant's house, the defendant's appearance, and then their asking the defendant to take a ride with them because everyone was talking. Det. Stewart testified that the defendant mentioned the cut on his hand, at which time they advised him of his rights. According to Det. Stewart, the defendant said he cut his hand on tin he was hauling for someone named Denham, but Det. Stewart testified that, when he talked to Denham, Denham did not believe it and said, as far as he knew, the defendant was not cut at all. Det. Stewart corroborated Det. Foster's testimony that on the way back to the defendant's house, they asked the defendant if those were the clothes he had worn the night before. Det. Stewart testified that the defendant replied that they were not, and that those clothes were at his house in the laundry. Det. Stewart stated that when they arrived at the defendant's house, his mother told them the clothes he was wearing were what he had on, but the defendant said they were not. Det. Stewart went inside with the defendant's mother, and she got the defendant's pants. Det. Stewart asked the defendant if those were the pants, and he replied that they were. The detectives then talked to Terry Pooler. They examined the pants at a car wash, which provided them lighting, and saw smeared blood on the pants. They then went to Mobil Mart to check for the money the defendant allegedly spent earlier.
Carolyn Booker, a forensic scientist specializing in serology, testified that she collected evidence at the crime scene, including a jumpsuit, a blood sample taken from the victim, a rape kit, fingernail and dirt scrapings, and smears of dried mud on the victim's legs and feet. Booker testified that the victim had Type B blood with a PGM enzyme of plus one plus two, and that she was a nonsecretor. Booker testified that analysis of the defendant's blood showed that he was Type B and a non-secretor, with a PGM enzyme of plus one. Booker looked at the defendant's jeans and saw mud and blood, including a blood smear almost in the shape *33 of two fingers. The blood on the defendant's jeans had a PGM enzyme of plus one, plus two, consistent with the victim's enzyme. Booker also analyzed Prokop's jeans, but found no blood on them. She found a small amount of human blood on the folding knife recovered from the scene of the crime, but the amount was too small to yield any other results. There was no semen detected in the rape kit. Booker testified that there was a semen stain on the jumpsuit, but she could not determine the blood type, only a PGM enzyme of plus one, minus two, which was not consistent with the victim or defendant. Booker stated that the stain's age could not be determined.
Anne Montgomery, Associate Director at Gentest Laboratory, testified that she tested blood from the victim and the defendant, bloodstains from the defendant's jeans, and nail clippings from the victim's left and right hands. According to Montgomery, the jeans stains yielded no results. The scrapings from the victim's right fingernail yielded a type 2,3 DNA, which was the victim's type of DNA; no foreign DNA was present. The scrapings from under her left fingernail yielded 2, 3, and 1.2, 4 DNA, the latter type which was foreign to the victim. Montgomery explained that, based upon the published literature regarding how common or rare the DNA types are, as to the foreign DNA found under the victim's left fingernail, one in 3,700 Caucasians would have this DNA and one in 270 blacks would have this DNA. Montgomery testified that the 1.2, 4 DNA was consistent with the defendant, and that he could have been the donor of that DNA. Montgomery explained that the PCR (polymerase chain reaction) DNA tests could not specifically identify a person, but they could definitively exclude a person as the donor of the DNA. On cross-examination, Montgomery testified that there could have been other combinations of the DNA types, such as 2, 1.2, and 3,4, which would have been two entirely different people.
Dr. Emil Laga, a forensic pathologist, testified that he performed the autopsy on the victim. He stated that when he received the body, the victim was wearing curlers. Dr. Laga testified that the victim died from asphyxiation due to a fatal nine inch slash wound to her neck, which cut her throat, esophagus, carotid artery, and jugular vein. According to Dr. Laga, there was evidence of an attempt to cut deeper into the victim's neck. Dr. Laga testified that the wound the victim sustained would have resulted in her death in at most five minutes. He testified that the victim also sustained a stab wound to the abdomen which was six to seven inches deep and was potentially fatal, as well as minor knife wounds to her left arm, shoulder, and legs. Dr. Laga estimated that the victim died between midnight and 6:00 a.m.
Junior Stimmage testified that, about a month before the victim's murder, he ran into the defendant, and the defendant asked him to go with him to the victim's house to get a tiller. At the time, Stimmage was working for the Livingston Parish Sheriff's Office. The defendant told Stimmage that the victim had the tiller, but it belonged to him. The defendant sounded like he was upset about it. The defendant told Stimmage he had gone to the victim's house before and she refused to let him have the tiller. Stimmage went with him the second time, and the victim was not home; the defendant was unable to get the tiller.
Karen Hull, a secretary for the Livingston Parish District Attorney's Office, testified that in May, 1991, she typed and filed a bill of information in which the victim was the complainant and the defendant was the named the defendant. Hull testified that on October 29, 1992, trial was held and the defendant was found not guilty. Within an hour of the not guilty finding, Hull was asked to type another bill of information on the defendant from the same incident with the victim being the complainant; the bill was later filed. Hull testified that other court dates, December, 1992, January, 1993, and February 18, 1993, were connected with this second bill of information. According to Hull, a motion to quash was filed on February 18, 1993, and was scheduled to be heard on March 25, 1993, but it was continued to April 29, 1993. The motion was never heard because the charge was dismissed due to the victim's death. Faye Williams, the warden's secretary at the Livingston Parish Prison, *34 testified that in May, 1991, the defendant was booked into jail and he remained there until October 29, 1992, when he was released.

DENIAL OF CHALLENGES FOR CAUSE

ASSIGNMENTS OF ERROR NUMBERS 1, 2, AND 6

TRIAL COURT'S COMMENTS AND DEFENSE COUNSEL'S QUESTIONING ABOUT PHOTOGRAPHIC EVIDENCE DURING VOIR DIRE

ASSIGNMENTS OF ERROR NUMBERS 5 AND 11
In assignments of error numbers 1, 2, and 6, the defendant contends the trial court erred in denying his challenges for cause of prospective jurors, John Salassi, Alan Ivanyisky, and John Allen, respectively.
Article 797 of the Louisiana Code of Criminal Procedure states, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
....
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; ...
A trial court is vested with great discretion in ruling on a challenge for cause, and its ruling will not be disturbed unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Robertson, 92-2660 (La. 1/14/94); 630 So.2d 1278. See also State v. Ross, 95-1240 (La.App. 1 Cir. 5/10/96); 674 So.2d 489.
The defendant challenged Salassi on the basis that he demonstrated an inability to follow the law because when asked by the defense counsel what his verdict would be if the state did not prove its case beyond a reasonable doubt, even after being informed of the state's burden of proof, Salassi responded he did not know. However, the following question which the defense counsel posed to Salassi concerning the burden of proof was complicated:
Q. Let's talk a little bit about the burden of proof in this case. You have heard from us now that the State's burden is to prove its case beyond a reasonable doubt, whatever that is. And the judge will tell you what that is, basically a doubt which you can give a good reason to. The State has to prove each and every element of the offense beyond a reasonable doubt. So, if I was to say to you, for instance, we were involved with an occurrence that requires 10 different elements to proof [sic] a case and the State came to you and proved 0 [sic] of those elements beyond a reasonable doubt and on the 10th element you had, you could give a good reason to doubt that one, what would be your obligation as a juror?
A. I don't know, man.
Q. Well, let's go back over it. Their burden
A. If I had mine.
Q. Nine out of 10.
A. I would have to go with the nine out of 10.
Q. That is pretty close. That is pretty good. But they didn't prove one of the elements and keep in mind they have to prove every element beyond a reasonable doubt, and one of those elements in your mind wasn't beyond a reasonable doubt. You would still go with nine out of 10?
A. I would have to.
The court then explained to the jury that counsel's question concerning nine or ten elements was misleading and that normally there were four or five elements, all of which the state must prove beyond a reasonable *35 doubt. At that point, the defense counsel did not question Salassi again. When all of the jurors were later asked by the defense counsel, "If after all of the evidence is in in this case, and you are not convinced beyond a reasonable doubt that the State has proven its case, what would your verdict be?" Salassi responded, "Not guilty." Based on Salassi's affirmative answer when the question concerning reasonable doubt was put to him in a clear and straight-forward fashion following the court's clarification and his answers in the remainder of the voir dire, the trial court did not err in denying the defendant's challenge for cause. See State v. Maize, 94-0736 (La.App. 1 Cir. 5/5/95); 655 So.2d 500, writ denied, 95-1894 (La. 12/15/95); 664 So.2d 451. Thus, assignment of error number 1 lacks merit.
Defendant challenged Ivanyisky due to his friendship with a witness, Dillard Stewart, a detective for the Livingston Parish Sheriff's Office. Ivanyisky testified that Det. Stewart was a friend of his father and of his family who had been to his house and had socialized with him. Ivanyisky testified he did not see Det. Stewart on a regular basis, but considered him an acquaintance. He stated that their relationship would not affect his ability to treat Det. Stewart as he would any other witness and to judge him as a witness based on what he said in court, not on their acquaintance. Ivanyisky told the defense counsel that he would not have a problem facing Det. Stewart later if he found the defendant not guilty and that he would not hold it against the defendant if the defense counsel treated Det. Stewart "badly" on the witness stand.
It is well-settled that relationship to a law enforcement officer is not, of itself, grounds for a challenge for cause. Rather, the question presented is whether or not the prospective juror could assess the credibility of each witness independent of his or her relationship with members of law enforcement. State v. Ross, 95-1240 at p. 3, 674 So.2d at 492. Contrary to the defendant's argument, a review of Ivanyisky's responses indicated that he would not be affected by any relationship to a law enforcement officer. Accordingly, we find no abuse of discretion by the trial court in denying the defendant's challenge for cause of Ivanyisky. See State v. Carlos, 618 So.2d 933 (La.App. 1 Cir.), writ denied, 623 So.2d 1305 (La.1993). Assignment of error number 2 has no merit.
The defendant challenged Allen for cause due to his reluctance to look at photographs of the victim.[2] When the prospective jurors were asked whether anyone had prior jury service, Allen testified that he was on a jury in a first degree murder trial four years before the present case. When asked if anything about that experience would affect his ability to be fair and impartial in this case, he answered that he was "not sure" he could look at the photographic evidence. The following colloquy transpired later in the voir dire:
Q.... Would you automatically regardless of what the pictures are have a problem looking at them, would it effect [sic] your ability to render a decision in this case?
A. I think I would have a problem looking at them yes.
Q. They would physically make you ill? I don't want to put words in your mouth.
A. Just the emotional.
Q. Would you automatically feel like you need to convict because of the pictures?
A. No.
Q. Would you still be able to receive the instructions from the judge and follow the law as he gives it to you?
A. Yes.
Q. Now, Mr. Allen brings up a good point. Does anybody else feel that way about the pictures, that it might cause themand the bottom line question is, do you think looking at those pictures, any pictures in this case, that you would automatically convict and not hold the State to *36 its burden of proof in this case, but because of some unpleasant pictures you would automatically convict? Okay. Would you all follow the rules and the law as the judge gives you and render a decision based on the facts that you hear and the instructions that you receive in [sic] the judge? Okay.
The court then stated, "Let me just say one thing. There is absolutely no necessity for each and [every] individual juror to view the photographs if they don't want to. There is no requirement here." The prosecutor responded, "That is true. We publish the pictures to the jury, we would ask that everyone look at them though." The court then replied, "If they don't want to look at them, they don't have to look at them." The prosecutor concluded her questioning by asking if any juror had any reason that he or she could not be a fair and impartial juror. From the record, it appears that no juror replied affirmatively.
When questioned by the defense counsel, Allen stated that the trial he was previously involved in was a murder trial where a man shot a woman. He answered "yes" when asked if the pictures were "pretty gruesome" and testified that he remembered them vividly and to go through the experience again would be "very upsetting." The following colloquy transpired when Allen was questioned by the defense counsel:
Q. Mr. Allen, these pictures are going to show a cut across the neck, and a cut in the side. Knowing that these are the type of wounds you are going to see, do you think this is going to be more damaging to you than important for you to sit on this trial?
A. I am not going to look at them if I can help it.
Q. If you are picked as a juror and the judge says I am ordering you to look at these pictures.
A. Then I obviously will have no choice.
THE COURT: Come on now. I am not going to order him to look at the pictures and there is no question about the fact that the lady was dead. I mean, the question is, who did it. The pictures are really unimportant in this case.
The remainder of Allen's answers during questioning indicated that he could give the defendant the benefit of the presumption of innocence and that he was aware the state had to prove defendant guilty beyond a reasonable doubt.
It is not error for the trial court not to dismiss a juror who expresses some reservation about accepting the law, when, after additional questioning by the trial court and the state, the juror assures the trial court that he could apply the applicable law and give defendant a fair trial. State v. Ellwest Stereo Theatres, Inc., 412 So.2d 594 (La. 1982). After a particular review of those parts of the voir dire relating to the questioning of Allen, we find that he stated he could accept the applicable law and apply it. After questioning by the defense, Allen also stated he would look at the pictures if ordered to do so by the trial court. We find no abuse of discretion in the trial court's refusal to dismiss him for cause, and assignment of error number 6 has no merit.
In assignment of error number 5, the defendant contends the court erred in denying his motion for a mistrial on the basis that the court informed the jury that the photographs in this case were not important. In assignment of error number 11, the defendant contends the court erred in denying his oral motion for mistrial on the basis that the court informed the jury that the photographs were unimportant, precluding counsel from conducting a full voir dire on this issue.
Following the swearing in of the jurors, the defense counsel moved for a mistrial, contending that earlier he had asked the court to give a statement to the jury panel to correct its representation to the jury that the pictures were unimportant. According to the defense counsel, his request was denied. The court denied the defense counsel's motion for a mistrial. The prosecutor also asked for an admonition concerning the pictures. Immediately before opening statements, the trial court informed the jury as follows:
I would like to clarify just for the jury's part, I made some mention about photographs yesterday when we were in voir *37 dire and I don't mean to indicate that any evidence is not important. It is important. And unless it is terribly offensive to you, you should consider it.
In assignment of error number 5, the defense counsel contends that the trial judge cannot comment on the evidence in the presence of the jury under LSA-C.Cr.P. art. 772 and that such prejudicial conduct makes it impossible for defendant to obtain a fair trial. LSA-C.Cr.P. art. 772 provides, "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." However, the comments given by the trial court during voir dire were not prohibited comments on the evidence in the case because no evidence had yet been presented in the proceeding. See State v. Gallow, 338 So.2d 920 (La.1976). Even if the comments were construed to be a factual comment, however, in our opinion the error would not be reversible. The remarks did not relate either directly or indirectly to any of the grounds listed in Article 770 of the Louisiana Code of Criminal Procedure requiring a mistrial if requested.[3] At most, the comment would constitute a remark under Article 771 of the Louisiana Code of Criminal Procedure, which can be cured by an admonition.[4] Such an admonition was given. It is well settled that a verdict will not be set aside because of improper remarks by the judge unless the reviewing court is thoroughly convinced that the jury was influenced by the remarks and that they contributed to the verdict. State v. Gallow, 338 So.2d at 921-922. The trial judge's comments did not directly or indirectly refer to the defendant and did not amount to an expression of opinion by the trial judge regarding the defendant's guilt and, therefore, do not constitute reversible error. See State v. Joseph, 437 So.2d 280 (La.1983). The trial court did not err by denying the defendant's motion. Assignment of error number 5 is without merit.
In assignment of error number 11, the defense counsel alleges that the court's representation limited his questioning about the photographs and tainted jury selection, entitling him to a mistrial. In voir dire, the defense counsel began describing what the pictures showed, and the prosecutor objected on the basis that the defense counsel was going into the facts of the case. The court advised the defense counsel to move on, because the pictures had already been discussed and only Allen stated that he had a problem with the pictures.
The scope of voir dire examination is within the sound discretion of the trial court; its rulings will not be disturbed on appeal in the absence of a clear abuse of discretion. State v. Williams, 560 So.2d 519 (La.App. 1 Cir.1990). A review of its rulings should be undertaken only on the record of the voir dire examination as a whole to determine whether or not a sufficiently wide latitude was afforded the defendant in examining prospective jurors. State v. Burton, 464 So.2d 421 (La.App. 1 Cir.), writ denied, 468 So.2d 570 (La.1985).
*38 The defendant should be allowed to make such inquiries of prospective jurors as will enable him to secure his constitutional rights by eliciting facts which show grounds for challenges. His right to intelligently exercise cause and peremptory challenges may not be curtailed by the exclusion of non-repetitious voir dire questions which reasonably explore the prospective jurors' potential prejudices, predispositions, or misunderstandings relevant to the central issues of the particular case. However, voir dire examination may not encompass unlimited inquiry into all possible prejudices of prospective jurors, nor their opinions on the evidence (or its weight) to be offered at trial, nor hypothetical questions and questions of law which call for any prejudgment of supposed facts. State v. Bell, 477 So.2d 759 (La.App. 1 Cir. 1985), writ denied, 481 So.2d 629 (La.1986).
After considering the defense counsel's questions in light of the jurisprudence, we find no abuse of discretion by the trial court. The defense counsel was free to test the prospective jurors' reactions toward the photographic evidence, provided he did not attempt to inject purported facts of the case. The trial court did not unduly restrict defense counsel's voir dire examination on this subject. See State v. Thomas, 589 So.2d 555 (La.App. 1 Cir.1991). Thus, assignment of error number 11 has no merit.

BATSON

ASSIGNMENTS OF ERROR NUMBERS 3, 4, 8, AND 9
In assignment of error number 3, the defendant contends the trial court erred by denying his oral motion in which he alleged that the state used its peremptory challenges to excuse prospective jurors on the basis of race, violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In assignment of error number 4, the defendant contends the trial court erred by denying his oral motion to quash the entire jury venire on the basis that it was not representative of the black population of Livingston Parish. In assignment of error number 8, the defendant contends the trial court erred by denying his oral motion to quash the petit jury based on Batson. In assignment of error number 9, the defendant contends the trial court erred by denying his motion for a mistrial based on its denial of his motion to quash the jury venire and motion to quash the petit jury.
Following the parties' challenges for cause and peremptory challenges as to the first panel, the defendant commented that the state exercised a peremptory challenge as to Lartarsa Joseph, the only black on the fourteen person panel. The defendant then stated that by his count, there were 78 prospective jurors, of which four were black. (The court and the prosecutor later accepted defendant's numbers.) The defendant stated that the 1990 census he received from the Clerk of Court indicated that, in Livingston Parish, six percent of the population was black. He argued that the venire was not representative of the black population in the parish. The defendant alleged that the parish selected the jurors from voter registration rolls and driver's licenses, but that it should also use tax and welfare rolls. The defendant contended that, because the venire contained only four blacks and because the state had challenged Joseph, he had made out his prima facie case of discrimination. The court denied the defendant's motions, observing that the State had good reasons to excuse Joseph because she knew a number of people involved in the case and a number of witnesses.[5] After the jury was selected and sworn, immediately before opening statements, the defendant again challenged the *39 jury selection process based on Batson. He stated that of the twelve jurors, two were black and the remainder, including the alternate, were white. The defendant again urged his motion to quash the petit jury, and the court denied it. The defendant then moved for a mistrial, which the court denied.
A motion to quash based on the ground the petit jury venire was unconstitutionally drawn should be filed in writing prior to the beginning of the jury selection. See LSA-C.Cr.P. arts. 521, 532(9) and 535(C). See also LSA-C.Cr.P. art. 535, comment (c)(3); State v. Williams, 610 So.2d 991 (La. App. 1 Cir.1992). Additionally, an objection to the prosecutor's use of peremptory challenges of members of a certain race must be made before the entire jury panel is sworn. State v. Williams, 610 So.2d at 1002. The record shows that the defendant did not initially challenge the jury venire until after the voir dire of the first panel of prospective jurors, and he reurged this challenge after the jury was impaneled and sworn. The defendant objected to the prosecutor's use of peremptory challenges when the state challenged Joseph; he reurged this challenge after the jury was selected and sworn. Therefore, the defendant did not timely raise his challenges to the jury venire's racial composition, and he made only one timely Batson challenge.
Moreover, even if the defendant were not procedurally barred from advancing his assignment of error concerning the jury venire, his claims would be without merit. Concerning the defendant's contention that the court erred in denying his motion to quash the petit jury, LSA-C.Cr.P. art. 419(A) states:
A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
A defendant is not entitled to a petit jury which reflects the population of the community in every respect. State v. Lee, 559 So.2d 1310 (La.1990), cert. denied, 499 U.S. 954, 111 S.Ct. 1431, 113 L.Ed.2d 482 (1991). A venire reflecting exactly the complete representation of every group within a community would be impossible to seat. The defendant bears the burden of proving the grounds for setting aside the jury venire. That burden requires more than under-representation of a specific group in order to prove a systematic exclusion of that group. State v. Lee, 559 So.2d at 1313. Absent a demonstration that the practice discriminates against a certain class of people that results in a nonrepresentative cross-section of the community, voter registration rolls have been held constitutionally acceptable to draw a venire list. See State v. Loyd, 489 So.2d 898 (La.1986), cert. denied, 481 U.S. 1042, 107 S.Ct. 1984, 95 L.Ed.2d 823 (1987). See also LSA-C.Cr.P. art. 408.1. In this case, the defendant stated that he "would like to offer, file and introduce into evidence a 1990 census profile," but it is not in the record. However, even if the census were in evidence, the defendant has shown mere under-representation;[6] he has not demonstrated that voter rolls suppressed black representation. The defendant has failed to show that the venire should be quashed because "persons were systematically excluded from the venires solely upon the basis of race." LSA-C.Cr.P. art. 419(A). Other than arguing that only four blacks were in the venire from which the defendant's jury was selected, the defendant made no effort to establish his claim. Assignment of error number 4 is meritless.
The state exercised a peremptory challenge against prospective juror Joseph. During voir dire, Joseph indicated that one witness in the case was a first cousin, and she also knew three other witnesses and the victim's father. She also stated that she knew of the defendant and several of the other people on the witness list because she had lived in Springfield all of her life. She *40 testified that she had heard about the case and had heard of the victim, but did not know her. She also testified that she had four or five family members who lived in the Springfield area, one with whom she was close who had been arrested or convicted.
The defendant submits that he made a prima facie showing that the state's exercise of a peremptory challenge as to Joseph was part of a systematic exclusion of members of the black race from the jury. No additional timely Batson objections were made by the defense to other peremptory challenges by the state; therefore, we will consider only the challenge of Joseph. See State v. Ross, 95-1240 at p. 6, 674 So.2d at 493. In Batson, the United States Supreme Court adopted a three-step analysis to determine whether or not the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
Hernandez v. New York, 500 U.S. 352, 358-359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (citations omitted).
"The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett v. Elem., 514 U.S. 765, 767-768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). Because a trial judge's findings pertaining to purposeful discrimination turn largely on credibility evaluations, such findings ordinarily should be entitled to great deference by a reviewing court. Batson v. Kentucky, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. Reasons offered to explain the exercise of peremptory challenges should be deemed raceneutral unless a discriminatory intent was inherent in those reasons. See Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866.
State v. Ross, 95-1240 at p. 6, 674 So.2d at 493.
Our careful review of the entire record of the voir dire proceedings fails to disclose any error in the rulings of the trial court. The defense failed to establish a prima facie case of discrimination. See State v. Ross, 95-1240 at p. 6, 674 So.2d at 492-493. Further, even if we were to find that a prima facie case was established by the defendant, he has failed to carry his burden of proving purposeful discrimination in light of the voluntary, race-neutral reasons recognized by the court as having been offered by the State. See State v. Ross, 95-1240 at p. 6, 674 So.2d at 492-493. These assignments lack merit.

EXHAUSTION OF PEREMPTORY CHALLENGES

ASSIGNMENT OF ERROR NUMBER 7
In assignment of error number 7, the defendant asserts that the trial court erred by denying his oral motion for mistrial on the basis that the allegedly adverse rulings on his challenges for cause led to the use of all of his peremptory challenges, thereby preventing him from excluding Brenda Jarreau, Jim Gilbert, and James Augillard. Our jurisprudence states that prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. A ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Maxie, 93-2158 (La. 4/10/95); 653 So.2d 526. However, in this case, as discussed above concerning assignments of error numbers 1, 2, and 6, the trial court did not err in denying the defendant's challenges for cause; furthermore, while the defendant contends he exhausted his peremptory challenges, the record reflects that the defendant exercised seven peremptory challenges and is unclear as to which party exercised what type of challenges as to the remainder of the jurors. Therefore, assignment of error number 7 has no merit.

*41 REFERENCE TO VICTIM'S PRIOR OTHER CRIME

ASSIGNMENTS OF ERROR NUMBERS 12 AND 13
In assignment of error number 12, the defendant contends the court erred by granting the state's oral motion in limine precluding the defendant from commenting on a prior negligent homicide conviction of the victim, particularly during his opening statement. In assignment of error number 13, the defendant contends the court erred by denying his oral motion for mistrial on the basis that the trial court's granting of the State's motion in limine was incorrect. In its motion, the state argued that the defendant's defense was identity. Therefore, the state contended, evidence of an overt hostile act by the victim prior to being slain would be irrelevant, and without such evidence as a foundation, evidence of the victim's prior negligent homicide conviction would be inadmissible. The court granted the state's motion and informed the defense counsel he could introduce the evidence if the proper foundation were established. The court also indicated its willingness to hold a hearing before opening statements to establish such a foundation. However, the defendant did not request a hearing or attempt to establish such a foundation.
Article 404 of the Louisiana Code of Evidence states, in pertinent part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
....
(2) Character of victim. (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible;...
....
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
(2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the *42 victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.
The court did not err in granting the state's motion in limine. The defendant was restricted from introducing into evidence or commenting upon the victim's prior conviction unless the proper foundation was laid in accordance with LSA-C.E. art. 404. The defendant did not attempt to lay the foundation prior to or at trial. We note that in violation of the court's ruling on the motion in limine, but without objection by the state, the defendant did question Det. Foster on cross-examination regarding the victim's prior negligent homicide conviction without establishing a proper foundation. Det. Foster's testimony about the victim's negligent homicide conviction arose from the defendant's questioning about whether the father of the woman killed by the victim was a suspect in this case. Regardless, the trial court did not err in granting the state's motion and denying the defendant's motion. Assignments of error numbers 12 and 13 lack merit.

PRETRIAL RULINGSDEFENDANT'S OTHER CRIMES

ASSIGNMENT OF ERROR NUMBER 10
In assignment of error number 10, the defendant contends the court erred by denying his oral motion for a pretrial ruling to preclude the state from mentioning other crimes concerning the defendant. Prior to trial, the state notified the defendant in writing that it intended to use evidence of other crimes. The notice stated that the defendant committed the offense of second degree battery, a violation of LSA-R.S. 14:34.1, against the victim on May 2, 1991, and that the evidence of this offense would be used to establish defendant's motive. The notice then stated that the defendant was arrested for attempted aggravated rape, resisting arrest, and second degree battery on May 10, 1991. On April 30, 1992, the charges were dismissed. According to the notice, the defendant was indicted by the grand jury for the offense of aggravated rape. On October 29, 1992, the defendant was found not guilty by a jury. From May 10, 1991, until October 29, 1992, the defendant was in jail awaiting trial. On October 29, 1992, after the defendant's acquittal, the state charged the defendant with second degree battery. The state submitted that the prior history of the conflict between the defendant and the victim, the time the defendant spent in jail, and the subsequent filing of the additional charge, were the motive for his killing the victim.
Prior to trial, the court held a hearing wherein the state put forth the evidence it intended to offer at trial. This evidence concerned the procedural action taken by the District Attorney's Office and the effect it had on the defendant. The court ruled that the state could present its evidence, noting that the jury would be told that the defendant was found not guilty and that the evidence was being admitted for the sole purpose of showing motive. The defense counsel assigned error to the court's ruling and asked prior to trial that his objection be made general throughout the trial proceedings. The state commented on this evidence in its opening statement.
At trial, as earlier discussed, Karen Hull, an employee with the District Attorney's Office in Livingston Parish, testified that she typed and filed a bill of information in which the victim was the complainant and the defendant was named as the defendant in May, 1991. Hull testified that on October 29, 1992, trial was held and the defendant was found not guilty. Within an hour of the not guilty finding, Hull was asked to type another bill of information on the defendant from the same incident with the victim being the complainant. Hull testified that other court dates, December, 1992, January, 1993, and February 18, 1993, were connected with this second bill of information. According to Hull, a motion to quash was filed on February 18, 1993, and was scheduled to be heard on March 25, 1993, but it was continued to April 29, 1993. The motion was never heard because the charge was dismissed due to the victim's death. Williams testified that in May, 1991, the defendant was booked into jail and he remained in jail until October 29, 1992, when he was released.
*43 Concerning assignment of error number 10, we initially note that the only argument the defendant presents in brief to support his contention is the statement that, prior to using other crimes evidence, the state must provide advance notice to defendant of its proposed use, specify the purpose for which it is being offered, and demonstrate the ability to prove the other crime by clear and convincing evidence, citing State v. Prieur, 277 So.2d 126 (La.1973).
LSA-C.E. art. 404(B) states, in pertinent part:
(1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Assuming that the evidence presented by the state is regarded as an other crime, wrong, or act within the meaning of article 404(B), we find it was admissible to prove motive and intent. See State v. Qualls, 353 So.2d 978 (La.1977); State v. Dixon, 620 So.2d 904 (La.App. 1 Cir.1993). Furthermore, we find the state properly notified the defendant and that the state established by clear and convincing evidence that the defendant was charged with a crime by the victim, found not guilty, and then charged again with a crime. We also note that while the state in its questioning of Det. Foster asked the detective if he had had a conversation with the defendant regarding charges the victim filed against him, and thus limited its questioning to the fact that charges were filed, the defense counsel on cross-examination of Det. Foster asked him whether he was aware that there was an allegation by the victim against the defendant that he beat and raped her; the defense counsel also asked the detective if he was aware that the defendant was charged with aggravated rape. Assignment of error number 10 has no merit.

EMOTIONAL SPECTATORS IN COURTROOM

ASSIGNMENT OF ERROR NUMBER 14
In assignment of error number 14, the defendant alleges that the court erred by failing to remove spectators from the courtroom who displayed emotional reactions during the victim's mother's testimony. During Mrs. Willis' testimony, the defense counsel asked that the jury be excused, and then stated that some individuals attending the trial in the front of the courtroom were weeping uncontrollably. The defense counsel requested that the court ask these spectators to control themselves or leave because he said that the jurors were watching them. The defense counsel then seemed to ask that these spectators be asked to sit outside during the testimony due to the potential additional distraction of the spectators standing up and walking out of the courtroom in a highly emotional state, which the defense counsel contended would be highly prejudicial. The court commented that it had not noticed this problem in the courtroom, and made the following statement:
[P]eople in the audience, you have to understand that your actions in the audience may effect [sic] this trial and if it does, it may be adverse to the best interest of everybody, and if you can't control your emotions I am going to have to ask that you leave the courtroom. I am not going to suggest that anybody is not entitled to stay in the courtroom, but you are not entitled to stay in here if you can not control your emotions so that they don't effect [sic] the jury. You have to consider that. What you do might have an adverse effect on the jury. It may notI am going to ask that if you don't feel like you can control your emotions you are going to have to leave the courtroom.
The defendant objected on the basis that the court did not forbid the spectators to *44 remain in the courtroom. The defendant did not request a mistrial.
Initially we note that, when an objection is overruled, no motion for mistrial is required to preserve the error for review. State v. Williams, 373 So.2d 1278 (La.1979); State v. Maillian, 464 So.2d 1071 (La.App. 1 Cir.), writ denied, 469 So.2d 982 (La.1985).
Article 775 provides for a mistrial if prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to obtain a fair trial or when authorized under articles LSA-C.Cr.P. arts. 770 or 771. Article 771 is concerned with prejudicial remarks made by persons other than the court, district attorney, or court officials, and provides that, if the remark is not within the mandatory provisions of article 770, the court may, in its discretion, grant a mistrial rather than admonish the jury to disregard the prejudicial remark. Mistrial is a drastic remedy. When the conduct does not fall within the mandatory mistrial provisions, the judge has the sound discretion to determine whether the activity or comment is so prejudicial to the defendant that he could not receive a fair trial. State v. Narcisse, 426 So.2d 118, 133 (La.), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983); State v. Wright, 441 So.2d 1301, 1306 (La.App. 1 Cir.1983).
We find no abuse of discretion in the denial of the requested mistrial. In State v. Domangue, 350 So.2d 599 (La.1977), the supreme court found that a mistrial was not necessary when a rape victim's spouse began crying and was removed from the courtroom during closing arguments. See also State v. Johnson, 475 So.2d 394 (La.App. 1 Cir.), writ denied, 478 So.2d 143 (La.1985); State v. Wright, 441 So.2d at 1306. In this case, no verbal outburst occurred, and the emotional reactions were such that the trial court did not become aware of them until the defense counsel brought them to its attention. The spectators were promptly advised, out of the jury's presence, to control their emotions. We are satisfied that the incident did not deprive the defendant of a fair trial, and find assignment of error number 14 to be without merit.

REFERENCE TO OTHER CRIMES AND CHARACTER EVIDENCE IN LAY WITNESS' TESTIMONY

ASSIGNMENTS OF ERROR NUMBERS 15 AND 16
In assignment of error number 15, the defendant contends the court erred by denying his oral motion for a mistrial on the basis that the testimony of the state's witness, Deborah Prokop, regarding other crimes evidence, was improper; in assignment of error number 16, the defendant contends the court erred by denying his oral motion for a mistrial based on Deborah's testimony in that it improperly referred to the defendant's character.
The defendant complains about the following testimony:
Q. Now, where did you see him [defendant], in front ofgive me a landmark.
A. It was in front of his mother's house, his mother has a trailer and his brother has a trailer next to her and we were on that street, of course purchasing the rock cocaine and he came up to the car needing a ride or wanting a ride.
Q. What happened then?
A. We told him that we wasn't going to give him a ride, that we used the excuse of not having that much gas and he started telling us that if we didn't have no gas that we could go to Other's, I think that is his name, and he would get us a dime rock or so forth to do for gas money if we would give him a ride up there to Other's.
....
Q. What was his attitude like?
A. Very persistent on wanting a ride, and of course, I didn't really want to give him a ride.
Q. You didn't?
A. No, I didn't.
Q. Why not?
A. Because I have always you know, been intimidated by Robert somewhat, just knowing how he was on the street, seeing him in action, I mean, his personality.
The relief the defendant seeks under assignment of error number 15 is pursuant to *45 LSA-C.Cr.P. art. 771 since the statement was made by a witness and not a court official. The applicable provisions of LSA-C.Cr.P. art. 771 provide, in pertinent part, as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
....
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
LSA-C.Cr.P. art. 770 provides, in pertinent part:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
....
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
....
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
A mistrial under the provisions of LSA-C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d 515 (La.1982); State v. Jack, 554 So.2d 1292 (La.App. 1 Cir.1989), writ denied, 560 So.2d 20 (La.1990). Moreover, mistrial is a drastic remedy which is only authorized where substantial prejudice will otherwise result to the accused. State v. Smith, 418 So.2d at 522. The jurisprudence has held that an impermissible reference to another crime deliberately elicited of a witness by the prosecutor would be imputable to the State and would mandate a mistrial. State v. Madison, 345 So.2d 485 (La.1977). However, unsolicited and unresponsive testimony is not chargeable against the State to provide a ground for mandatory reversal of a conviction. State v. Jack, 554 So.2d at 1296; State v. Thompson, 597 So.2d 43 (La.App. 1 Cir.), writ denied, 600 So.2d 661 (La.1992). Furthermore, a statement is not chargeable to the state solely because it was in direct response to questioning by the prosecutor. State v. Ondek, 584 So.2d 282 (La.App. 1 Cir.), writ denied, 586 So.2d 539 (La.1991). Finally, while a prosecutor might have more precisely formulated the question which provoked a witness's response, where the remark was not deliberately obtained by the prosecutor to prejudice the rights of defendant, it is not the basis for a mistrial. See State v. Lewis, 353 So.2d 703 (La.1977); State v. Feet, 481 So.2d 667 (La. App. 1 Cir.1985), writ denied, 484 So.2d 668 (La.1986).
In this case, the answer by the witness that the defendant would get them a "dime rock or so forth to do for gas money" was not a reference to another crime committed or alleged to have been committed by the defendant. LSA-C.Cr.P. art. 770. The defendant's action did not constitute a conspiracy to distribute cocaine, as the defense counsel urged in objecting to Deborah's testimony, nor did it constitute an attempt to distribute cocaine. See LSA-R.S. 14:26, 14:27, 40:967. See also State v. Jones, 607 So.2d 828 (La.App. 1 Cir.1992), writ denied, 612 So.2d 79 (La.1993). A mere statement of an intent to commit a crime does not become a criminal attempt or a conspiracy unless it is accompanied by some overt act. LSA-R.S. 14:26, 14:27. Criminal conspiracy or attempt requires that, in addition to the agreement to commit a crime, one or more of the parties *46 must do something in furtherance of that agreement. There is no evidence of an overt act in the record before us. See LSA-R.S. 14:26(A). Under these circumstances, the trial court's denial of the motion for mistrial was not an abuse of discretion. Assignment of error number 15 is without merit.
Concerning Deborah's testimony that she did not want to give the defendant a ride because she was intimidated by the defendant "just knowing how he was on the street, seeing him in action, I mean, his personality," the defendant contends this testimony is an impermissible reference to the defendant's character. Article 404(A) of the Louisiana Code of Evidence states, in pertinent part, "Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion...." Initially, we note that the defendant did not preserve this issue for appeal. A contemporaneous objection is necessary to preserve an issue for appellate review. See LSA-C.Cr.P. art. 841. An objection made after the evidence is before the jury comes too late. State v. Bretz, 394 So.2d 245 (La.), cert. denied, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); State v. Williams, 610 So.2d at 1008. Deborah had answered this question before counsel objected, and the objection came after a recess. After the objection, the state did not continue further with the line of questioning. Additionally, the defendant did not specifically move for a mistrial or request an admonition; the defense counsel asked the court, "What is your ruling on her testimony on the bad character in the community?" Thus, the defendant is barred procedurally from advancing this assignment of error on appeal.
Assuming the defendant properly preserved the issue, as earlier stated, we do not find that Deborah's explanation for not wanting to give the defendant a ride, that is, her reference to the fact that the defendant intimidated her, was highly prejudicial to the defendant's right to a fair trial. There is no showing of clear prejudice to the defendant since the statement was Deborah's explanation of why she did not want to give defendant a ride, and it is not a clear reference to the defendant's character admitted to prove that he murdered the victim. Furthermore, we cannot find, nor does the defendant claim, that if Deborah's reference is construed as an improper reference to the defendant's character, that it was deliberately obtained by design of the prosecutor to prejudice the rights of the defendant. Consequently, LSA-C.Cr.P. art. 771 did not mandate a mistrial. Moreover, the defendant never requested an admonition. See State v. Thompson, 597 So.2d at 47. For the foregoing reasons, assignment of error number 16 is without merit.

RELEVANCY OF LAY WITNESS' TESTIMONY

ASSIGNMENT OF ERROR NUMBER 17
In assignment of error number 17, the defendant contends the court erred by overruling his objection to the relevancy of a question asked of Danny Jackson by the state. Jackson testified he was with the defendant the day before the victim was murdered, and during that day, the defendant and his brother confronted one another. The state asked Jackson what the defendant told his brother. Jackson replied, "[H]e said that he would kill him and think nothing of it." The state asked what the defendant did. The defense counsel then objected on the basis of relevancy, arguing that the confrontation occurred twelve hours before and ten miles away from the murder. The court overruled the objection. Jackson testified that when the defendant made that statement, "He made a motion with his hand and said that, that he would cut his throat and think nothing of it."
Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA-C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. LSA-C.E. art. 403. In questions of relevancy, much discretion is vested in the trial court. Such rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. State v. Trosclair, *47 584 So.2d 270 (La.App. 1 Cir.), writ denied, 585 So.2d 575 (1991).
The defendant's comments to his brother that "he would kill him" and that "he would cut his throat" about twelve hours before the offense where the victim was killed by having her throat cut tended slightly to increase the likelihood of his guilt. Any prejudice in the statements is outweighed by their probative value. We find no abuse of discretion in the trial court's overruling of the defendant's objection.
In brief, the defendant also states that the evidence was an impermissible reference to another crime, wrong, or act. The defense counsel must state the basis for an objection when it is made, pointing out the specific error to the trial court. The grounds for objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and prevent or cure any error. LSA-C.E. art. 103(A)(1); LSA-C.Cr.P. art. 841. Because the defendant failed to object on this basis at trial, he cannot now urge this ground on appeal. State v. Leblanc, 618 So.2d 949 (La. App. 1 Cir.1993), writ denied, 95-2216 (La. 10/4/96); 679 So.2d 1372. Moreover, we do not believe that this statement by the defendant falls within the scope of article 404(B)(1). This assignment of error lacks merit.

IMPEACHMENT OF WITNESS WITH ARRESTS

ASSIGNMENT OF ERROR NUMBER 18
In assignment of error number 18, the defendant contends that the court erred in sustaining the state's objection to the defense counsel's questioning of Danny Jackson on cross-examination regarding pending criminal charges against him. The defense counsel asked Jackson what he was arrested for, possession or distribution of cocaine; the state objected, but Jackson answered, and then the defense counsel asked whether there were any other charges pending against him. The state objected on the basis that counsel could only inquire as to convictions. The court sustained the objection.
LSA-C.E. art. 609.1 states, in pertinent part:
A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.
B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.
While the introduction of extrinsic evidence, such as an arrest, may be used to attack a witness on the basis of bias, such as where the defense counsel is referring to pending charges which might be part of an alleged deal between Jackson and the state, the defendant must lay a proper foundation during the cross-examination of the witness sought to be impeached. See State v. Glynn, 94-0332 (La.App. 1 Cir. 4/7/95); 653 So.2d 1288, writ denied, 95-1153 (La. 10/6/95); 661 So.2d 464. Following the state's objection, the defense counsel was allowed to explore on cross-examination the allegation that Jackson had made a deal with the state to have his present sentence reduced. After that questioning, he asked Jackson if the state had dropped any charges on him, to which the prosecutor did not object, and to which Jackson replied that the state had not. Neither at the trial, nor in his brief to this court, has the defendant identified any previous charges or explained how or why they were independently relevant to show bias. Moreover, the defendant in brief gives no support for his contention that the trial court erred. Under these circumstances, the trial court properly sustained the prosecutor's objection. See State v. Glynn, 94-0332 at p. 25, 653 So.2d at 1307. The assignment of error is without merit.

LAW ENFORCEMENT OFFICER'S TESTIMONY CONCERNING BAD CHARACTER AND OTHER CRIMES EVIDENCE

ASSIGNMENT OF ERROR NUMBER 21
In assignment of error number 21, the defendant contends the court erred by denying *48 his oral motion for a mistrial on the basis that Det. Foster's testimony concerned the defendant's bad character and contained other crimes evidence, and the state failed to notify the defendant of its intent to use such evidence.
Defendant is complaining about the following testimony:
Q. Did the defendant make any statement about those pants as far asdid you ever tell him that you saw blood on them:
A. Later.
Q. What did you tell him?
A. Well, the next day we arrested him for a misdemeanor theft. That night we didn't go backwe didn't go back and tell him anything about what we thought was blood on the pants that night, because in the car we couldn't see what looked like blood. It was when we took it to the car wash. Now, I did see him later that night. I was over at Glen Smith's house picking up some jewelry that he had sold and he came over there, but I didn't mention what we thought was blood on the pants to him at that time.
The defendant objected following this testimony and later moved for a mistrial, which the court denied.
A police officer is not a court official within the meaning of LSA-C.Cr.P. art. 770. State v. Brown, 95-0755 (La.App. 1 Cir. 6/28/96); 677 So.2d 1057. Therefore, the applicable provisions of LSA-C.Cr.P. art. 771 apply. State v. Jack, 554 So.2d at 1296. As earlier stated, a mistrial under the provisions of LSA-C.Cr.P. art. 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Smith, 418 So.2d at 522; State v. Brown, 95-0755 at p. 16, 677 So.2d at 1068. A prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial and may require the granting of a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. The decision as to the necessity of granting a mistrial under these circumstances is left to the sound discretion of the trial court. State v. Douglas, 389 So.2d 1263 (La.1980); State v. Brown, 95-0755 at p. 15, 677 So.2d at 1068. The jurisprudence interpreting LSA-C.Cr.P. art. 771 has held that an impermissible reference to another crime deliberately elicited of a witness by the prosecutor would be imputable to the state and would mandate a mistrial. State v. Madison, 345 So.2d 485 (La. 1977); State v. Overton, 337 So.2d 1201 (La. 1976); State v. Jack, 554 So.2d at 1296. However, unsolicited and unresponsive testimony from a police officer is not chargeable against the state to provide a ground for mandatory reversal of a conviction. State v. Fowlkes, 352 So.2d 208 (La.1977); State v. Jack, 554 So.2d at 1296.
The reference to the misdemeanor theft was not responsive to the prosecutor's question to Det. Foster inquiring as to what Det. Foster told the defendant about the blood he saw on the defendant's pants. Moreover, we cannot find, nor does the defendant claim, that the reference to this other crime was deliberately obtained by design of the prosecutor to prejudice the rights of defendant. See State v. Ellison, 572 So.2d 262 (La.App. 1 Cir.1990), writ denied, 575 So.2d 388 (La.1991). Additionally, the defense counsel questioned Det. Foster on cross-examination about the arrest of the defendant for misdemeanor theft. In response to the defense counsel's questions, Det. Foster testified that Eddie Prokop, another suspect in the case, filed the misdemeanor theft charge against the defendant and that the alleged offense would have occurred the day before the victim was killed. Det. Foster testified that Eddie claimed he had a radio and knife stolen. Under the circumstances of this case, LSA-C.Cr.P. art. 771 does not mandate a mistrial.
While the trial court did not admonish the jury after the officer's remark, LSA-C.Cr.P. art. 771 mandates a request for an admonishment. As a result, the trial court's failure to instruct the jury to disregard the remark referring to other crimes allegedly committed by defendant, absent a request, was not, in itself, reversible error. State v. Tribbet, 415 So.2d 182 (La.1982); State v. Jack, 554 So.2d at 1296.
*49 Finally, the requirement that the state notify defendant of its intent to introduce evidence of another crime is not applicable where a police officer gives unsolicited and unresponsive testimony concerning another crime. The defendant's assignment of error number 21 has no merit.

ADMISSION OF PHYSICAL EVIDENCE

ASSIGNMENTS OF ERROR NUMBERS 19, 20, 22, 23, AND 26
In assignments of error numbers 19 and 20, the defendant contends the court erred by overruling his objections of relevancy to the introduction of a knife and a second knife into evidence. During the trial, the state introduced two knives into evidence, Exhibits S-13 and S-15. Det. Foster seized one of the knives (Exhibit S-13), a "folding blade knife," after he observed it "mixed up in" clothes at the foot of the bed where the victim's body was found. The other knife (Exhibit S-15), a butcher knife, was seized during the search of the defendant's mother's house conducted pursuant to a search warrant; it was found under the mattress of the defendant's sister's bed. Det. Foster testified that when he found the victim's body, she was lying on a bed in blood with several wounds that appeared to be knife wounds; Det. Foster testified that her throat was cut. Dr. Laga, the forensic pathologist who performed the autopsy on the victim, testified that she sustained a fatal slash wound to the neck, which would have been inflicted by a cutting type of weapon that makes a slash; a stab wound to the abdomen, which would have been inflicted by an instrument with a blade which was approximately five to seven inches long and one to one and a half inches wide; and another slash wound to the arm, a scraping wound on the shoulder, and some cuts on her knees, all of which were knife wounds. Dr. Laga explained that the length of the weapon cannot be estimated from a slash wound as it can from a stab wound; he explained with a stab wound, it is possible to estimate the length, blade width, and thickness of the knife. Det. Foster testified that when they questioned the defendant after finding the victim's body, he had two cuts on his left hand. Carolyn Booker, the forensic scientist, testified that the folding knife had a small amount of human blood on its cutting edge.
As earlier stated, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." LSA-C.E. art. 401. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. LSA-C.E. art. 403. In questions of relevancy, much discretion is vested in the trial court. Such rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. State v. McCutcheon, 93-0488 (La.App. 1 Cir. 3/11/94); 633 So.2d 1338, writ denied, 94-0834 (La. 6/17/94); 638 So.2d 1093.
The presence of a knife hidden beneath a mattress in the defendant's house in a case where the victim was stabbed to death tends to increase the likelihood of his guilt in light of the coroner's testimony that the victim was stabbed to death. The presence of another knife in the bed with the victim's body where the defendant had cuts on his hand tends to increase the likelihood of the defendant's guilt. Although the knives were not identified as being those the defendant used, the issue of the identification of the knives goes to the weight of the evidence rather than to its admissibility. The connexity is a factual matter for consideration by the jury. See State v. Robertson, 421 So.2d 843 (La.1982); State v. McCutcheon, 93-0488 at p. 9, 633 So.2d at 1343.
The present case is distinguishable from the case relied upon by the defendant, State v. Manieri, 378 So.2d 931 (La.1979), wherein the court found that the trial judge erred in admitting three knives into evidence where none of the knives had bloodstains, one of the knives was found in the kitchen drawer of the victim's residence, a state witness testified that none of these knives were the murder weapon, and no effort was made to connect the knives with the accused or the crime. In this case, as earlier discussed, the state presented more evidence to connect *50 the knives to the crime and the defendant. The assignments of error are without merit.
In assignment of error number 22, the defendant contends the court erred by overruling his objection to the introduction of a pair of pants into evidence based on the failure to establish a proper foundation through a chain of custody. The defendant complains that the bag containing the pants did not contain a submission slip from the crime lab. To be admitted at trial, demonstrative evidence must be identified. This identification can be visual, that is, by testimony at trial that the object exhibited is the one related to the case. Alternatively, the evidence can be identified by a chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it was offered into evidence. A sufficient foundation for the introduction of demonstrative evidence is laid if the evidence establishes that it is more probable than not that the object is the one connected to the case. Lack of positive identification or a defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. Ultimately, a chain of custody or connexity of the physical evidence is a factual matter for determination by the jury. State v. Glynn, 94-0332 at p. 7-8, 653 So.2d at 1297. A continuous chain of custody need not be established if the evidence as a whole establishes more probably than not that the object introduced is the same as the object originally seized by police officers. State v. McCabe, 420 So.2d 955 (La.1982).
Det. Foster testified that while talking to the defendant after the murder, he and Det. Stewart asked the defendant if the clothes he was wearing were what he had on the night before. The defendant told them he was wearing blue jeans with white spots, then he said the jeans were black. The detectives drove the defendant to his mother's house, and Det. Stewart went into the house with the defendant's mother and came out with black jeans with white spots with mud on them. The defendant identified the black jeans Det. Stewart had as the ones he was wearing on the night of the murder. Det. Stewart put the pants on the front seat next to him while he and Det. Foster drove to a car wash and took the pants out of the car to look at them in better light. Returning to the car, Det. Stewart again put the pants next to him, and when he and Det. Foster went to a gasoline station to check on some other information about the case, he picked up a paper bag to put the pants in. He put them in the bag, then put the bag in the trunk of his car, and locked his trunk for the rest of the night. The next morning, Det. Stewart took the pants to the State Police Crime Lab in Baton Rouge. Det. Stewart was shown the package he delivered to the crime lab containing the pants in court, and he stated that the package looked the same and that he was sure those were the pants he took to the crime lab. He testified that there should be a slip of paper given to him by the lab showing that the pants had been submitted. Although there was no paper, he testified that he was sure it was the same bag he delivered because it had the Livingston Parish Sheriff's Office label on it. When asked again about the submission slip, Det. Stewart testified that he knew the bag was the one he brought to the lab. We find that a sufficient foundation for the introduction of the pants was laid because the evidence established that it was more probable than not that the pants were those connected to the case. Assignment of error number 22 lacks merit.
In assignment of error number 23, the defendant contends the court erred by overruling his objection to the introduction of the crime scene video, based on its repetitive, cumulative, and inflammatory nature. As earlier stated, LSA-C.E. art. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." The issue of admissibility of a videotape is similar to the issue of the admissibility of still photographs; a videotape, like a photograph, may be admissible to corroborate other testimony in a case, such as location of the body; manner of death; specific intent to kill; number, location, and severity of wounds; and cause of death. State v. Davis, 92-1623 (La. 5/23/94), *51 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place, or thing depicted, are generally admissible, provided their probative value outweighs any prejudicial effect. State v. Glynn, 94-0332 at p. 9, 653 So.2d at 1298. The fact that the photographs are gruesome does not of itself render the photographs inadmissible. Merely because the video may be "cumulative" evidence does not render the tape inadmissible. A trial court's ruling on the admissibility of such evidence will be disturbed only if the prejudicial effect of the evidence outweighs its probative value. State v. Davis, 92-1623 at p. 24, 637 So.2d at 1023.
In this case, the videotape depicts the scene of the crime as the police officers found it. It shows the entrances and outside of the victim's house and place of business, the layout of the crime scene, the victim's body, and a footprint in the grass outside of the house, matters which corroborate other testimony and which illustrate the facts in the case. The probative value of this evidence outweighed any prejudicial effect. The videotape does not show the victim's wounds in a gruesome fashion. Accordingly, we find that the trial court correctly allowed this evidence to be admitted over the defendant's objections. This assignment of error is meritless.
In assignment of error number 26, the defendant contends the court erred by overruling his objection to items of evidence, based on the state's failure to furnish these items to the defendant prior to trial and due to their cumulative nature. Concerning Exhibits 29-32 which pertained to the DNA test results, the record shows that the defendant stated that he objected only to Exhibits S-29 and S-32. The defense counsel objected to Exhibit S-32, a chart, on the basis that it was cumulative and that he had not seen it before the trial. Exhibit S-32 is a chart giving a synopsis of the test results which were on Exhibits S-29, S-30, and S-31. Concerning Exhibit S-29, a transparency which contains detailed information regarding the D-1 S-80 gel results, counsel objected because it was not provided to him in discovery; defense counsel said he had received the results in a report, but not a copy of the transparency. The record does contain a response to discovery by the state wherein it was stated that the DNA results from the victim's fingernail from her left hand were 2, 3, 1.2, 4, both the victim's and defendant's DNA; these results were in part from the D-1 S-80 test. However, the record does not contain the specific information on the transparency in Exhibit S-29. When the defense counsel and the prosecutor were arguing over the admissibility of Exhibit S-29, the prosecutor stated that the state had given the defendant the paper copy of Exhibit S-29 in discovery; the defense counsel claimed that he had not received it, whereupon the prosecutor stated that he gave the copy to previous counsel in the case.
The state's failure to comply with discovery requests does not constitute reversible error unless actual prejudice results to the defendant. State v. Busby, 464 So.2d 262 (La.), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), vacated on other grounds, 538 So.2d 164 (La.1988). The defendant has failed to allege any actual prejudice to him due to the state's failure to comply with the defense discovery request at issue. Considering all of the circumstances present in this trial, we are convinced that no actual prejudice resulted. The chart and transparency were consistent with and cumulative of testimony given at trial. We note that the defense counsel admitted that Exhibit S-32 was cumulative, and, as earlier stated, the fact that evidence is cumulative does not render it inadmissible. See State v. Davis, 92-1623 at p. 24, 637 So.2d at 1026. The defense counsel's contention shows that he would not have been prejudiced from the failure to disclose this chart during discovery. Furthermore, there was no indication in the record, and not even an assertion by the defendant on appeal, that anything was learned from these exhibits that was not contained in the reports the state provided to the defense in discovery or in Montgomery's trial testimony. See State v. Busby, 464 So.2d at 264; State v. Bates, 95-1513 *52 (La.App. 1 Cir. 11/8/96); 683 So.2d 1370. Assignment of error number 26 is meritless.

DOCUMENTARY EVIDENCE IN JURY ROOM

ASSIGNMENT OF ERROR NUMBER 27
In assignment of error number 27, the defendant contends the court erred by denying his request to exclude certain documentary evidence from the jury room during deliberations. Following the reading of the verdict and the polling of the jury, the defense counsel stated:
Your honor, to make sure that the record was clear, during the deliberations evidence was brought back in to the jury room and the court let me reserve the right to make the objection on the record. Documentary evidence, at least in my estimation went back there dealing with the D.N.A. evidence. I objected to it going back into the jury room. The court obviously overruled that. To that, because it went back there, to that extent we would object to the court's ruling. Note assignment of error and ask for a mistrial.
The court denied the defendant's motion for a mistrial. Earlier in the trial, when the state wanted to publish the DNA evidence to the jury, the court informed the jury that it could look at the DNA records in the jury room during deliberations. The DNA evidence consisted of S-30, S-29, S-31, and S-32, exhibits introduced during the testimony of Anne Montgomery. Exhibits S-30 and S-31 were photographs of the actual test results for each of the individual tests, which are called reverse dot block hypertization tests, and the results appear as blue dots on strips. Exhibit S-31 was the DQA1 test results, and Exhibit S-30 was the amplitype PM test results with a chart showing actual alleles and genetic information. The test results for D-1S-80 were put on Exhibit S-29. Exhibit S-32, a chart, consisted of the information from Exhibits S-29, S-30, and S-31.
Initially, we note that the defendant offers no argument or authority in support of his contention, other than the bare assertion that the trial court erred. LSA-C.Cr.P. art. 793 states:
A juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
The Louisiana Supreme Court has recognized that jurors may, during deliberations, inspect physical evidence in order to arrive at a verdict but cannot inspect written evidence to assess its verbal contents. State v. Perkins, 423 So.2d 1103 (La.1982); State v. Freetime, 303 So.2d 487 (La.1974). The general rule, as expressed by Louisiana Code of Criminal Procedure article 793, is that a jury is not to inspect written evidence except for the sole purpose of a physical examination of the document itself to determine an issue which does not require the examination of the verbal contents of the document. For example, a jury may examine a written statement to ascertain or compare a signature, or to see or feel it with regard to its actual existence. State v. Johnson, 541 So.2d 818 (La.1989); State v. Perkins, 423 So.2d at 1109-1110; State v. Lewis, 590 So.2d 1266 (La.App. 1 Cir.1991), writ denied, 600 So.2d 634 (La.1992).
In State v. Freetime, 303 So.2d at 489, the supreme court held that allowing the jury to have a copy of defendant's confession to reread its verbal content during deliberations was error. In State v. Perkins, 423 So.2d at 1109-1110, the supreme court held that an inculpatory written statement by defendant should not have been allowed into the jury room for deliberations. State v. Johnson, 541 So.2d at 824-825, concerned the improper admission of an autopsy report, a crime lab report, and municipal court documents pertaining to one victim's request for the issuance of a peace bond against defendant where the only way such exhibits could be of any assistance to the jury was if they were examined for their verbal contents. In State *53 v. Lewis, 590 So.2d at 1268, this court determined that the trial court erred in allowing the jury to have a tape recorder and tape of the conversation between defendant and the undercover officer recorded on the night of the offense.
The documentary evidence given to the jury in this case was evidence requiring a physical examination to enable the jury to arrive at a verdict and, thus, the trial court did not err in giving it to the jury. In this case, the documentary evidence was a photograph of actual test results on DNA and the DNA results themselves in the form of numbers and letters. Thus, the evidence was not testimony or written evidence excluded by article 793. Unlike the cases discussed in the previous paragraphs, the DNA evidence in this case is analogous to a videotape, a photograph, or a map or plat of the scene of the crime, which are all reproductions of a physical object or scene that have been held to be properly allowed in the jury room during deliberations. See State v. Davis, 637 So.2d at 1025 (videotape properly allowed in jury room during deliberations); State v. McKinney, 174 La. 214, 140 So. 27 (1932) (map should have been allowed in jury room). See also State v. Lewis, 611 So.2d 186 (La. App. 5 Cir.1992) (fingerprints and bill of information containing item number matching number on arrest registry containing fingerprints properly viewed by jury); State v. White, 543 So.2d 611 (La.App. 2 Cir.1989) (jury could view photograph of crime scene). In McKinney, the supreme court stated:
[A] plan, plat, map, picture, photograph, or model, is simply a miniature reproduction of the physical object, or thing, which it represents; and is intended for the convenience and information of those who might otherwise wish, or be obliged, to inspect the object or thing itself. Hence whenever any plat, photograph, model, etc., is offered in evidence, it is as if the thing itself which it represents had been offered in evidence. And since, by the very terms of the Code [article 305 of the Code of Criminal Procedure of 1928[7]], the jury `may take with them when they retire to deliberate any object * * * that requires a physical examination to enable them to arrive at a just conclusion' it follows that they may also take with them the miniature reproduction of such object produced for their convenience and information.
140 So. at 27-28.
That there is writing on the DNA results in this case does not make the evidence unallowable in the jury room because any examination of the DNA test results strictly for their verbal contents would be fruitless as the written notations on the test results are in the form of labels of test samples and results consisting of numbers and letters. This assignment of error lacks merit.

DNA EVIDENCE

ASSIGNMENTS OF ERROR NUMBERS 24 AND 25
In assignment of error number 24, the defendant contends the court erred by overruling his objection to Anne Montgomery's testimony about DNA test results based on the state's failure to establish the proper functioning of the equipment used to conduct the tests; in assignment of error number 25, the defendant contends the court erred by overruling his objection to Montgomery's testimony concerning statistics presented by Montgomery due to the state's failure to establish a proper foundation.
On direct examination, Montgomery, Associate Director at Gentest Laboratory, a DNA analysis laboratory, testified that she had a bachelor of science degree and a master's degree, and that her area of study was DNA mapping and profiling. In 1990, she helped the Gentest Laboratory start up by writing the protocols and all of the validation procedures involved in setting up a DNA laboratory. She testified she took continuing *54 education courses involving DNA analysis, attending a workshop shortly before trial involving forensic statistics and calculations. She also had published articles which were presented at peer review meetings involving validation studies for DNA testing of the systems used at Gentest Laboratory. She is a member of numerous associations involving identity testing. Montgomery testified she is considered to be an expert in molecular biology and DNA analysis. Montgomery was tendered as an expert, the defense counsel had no questions, and the court accepted her as an expert.
Montgomery explained what DNA is and then testified that the selected genetic markers which are tested in the forensic laboratory "have been very well studied and characterized by the medical community prior to our using them." Montgomery continued, "[I]t is very important that these markers have gone through exhaustive validation studies...." Montgomery explained that DNA degrades, but that the PCR test performed on the DNA elicits no result with a degraded sample, so that there is no risk of a false positive.
Montgomery explained the procedure for the actual testing. Montgomery explained during the processing she ran a positive control, a negative control, and a buffer control during the experiments. She stated that she was not allowed to interpret the results if the controls did not come out with the expected results. More specifically, Montgomery stated:
The positive control is a known DNA that we know and know all of the characterizations to it and when we run it through the testing procedure it should give me the expected result. If it doesn't, it invalidates my experience [sic]. A negative control is important because it tells you that amplification test doesn't have any contamination, any DNA that shouldn't be there in your processing. The buffer control is another test tube that originates when you start processing your sample and that tube is extremely important as well. All of my chemicals and reagents and solutions that are used in this testing are put in that tube. Everything that is done to my evidence sample is done to that buffer control sample, and this is a good test to make sure all of my chemicals, and reagents are free of extraneous DNA and those controls were done in this case.
Montgomery explained that she tested the reference blood samples from the victim and the defendant, and then the evidentiary samples. When Montgomery began testifying as to the results, the defense counsel objected that the testimony was inadmissible because the state had not established a foundation. The defense counsel asked Montgomery if any of the testing was done with machinery, to which she replied, "The PCR cycler, yes." The defense counsel contended certification that this machinery was in proper order was necessary before the testimony could be admitted, such as is necessary with blood alcohol results. The court overruled the objection, finding that the state had established a proper foundation and that the defense counsel could question Montgomery on cross-examination about the machinery.
During the continuation of direct examination, Montgomery explained that the tests on the evidence samples were supposed to provide known results, and that if they did, she knew her testing process was performed properly and she could interpret the sample. On cross-examination, defense counsel asked Montgomery whether she had a certification of the machine which she put the blood through with her, and she replied that she did not have a certification with her. When re-examined by the prosecutor, Montgomery was asked if there was, to her knowledge, any requirement imposed by law for certification of the machines before she could testify in court. She answered that there was not, and explained further:
I think the important item to think about and keep in mind with the equipment are the controls. If there is a problem or malfunction with the piece of equipment that I am using the controls would not give me the expected results, and that would invalidate the experiment. In addition to that, there are tests that we run on this machine monthly to determine if it is reaching the correct temperatures and performing the way it is suppose [sic] to *55 perform and those tests are done and the machine is within specs, with range for these tests.
The defense counsel also objected when Montgomery testified that she would give the statistics as to how rare the foreign genetic marker found in the material under the victim's left fingernail was. The defense counsel argued that the proper foundation had not been laid for Montgomery to give those statistics. The court overruled the objection. Following the defense counsel's objection, Montgomery explained:
[W]hen we look at a data base populations, we look at a minimum of 100 randomly selected individuals from a given race group and we'll test them and then we'll found out how common or our [sic] rare the genetic marker results are for these race groups. This information in DNA is published in peer review literature. It has been repeated at our laboratory, a number of laboratories around the country, and our data base information is consistent with the published literature and that is what we cite and refer to when we talk about these kind of numbers.
In assignment of error number 24, the defendant contends that Montgomery's testimony was inadmissible because the state failed to establish that the testing equipment functioned properly. However, Montgomery testified that she performed the testing in this case and, as associate director of the DNA testing laboratory, she set up the validation procedures. Furthermore, she explained in detail the measures taken to insure accurate results. Unlike blood alcohol tests, where in order for the state to avail itself of the statutory presumption of a defendant's intoxication arising from a chemical analysis of his blood under LSA-R.S. 32:662, the state must show that it has promulgated detailed procedures which insure the integrity and reliability of the chemical test, including provisions for repair, maintenance, inspection, cleaning, certification, and chemical accuracy, and that there has been strict compliance with the promulgated regulations, there are no such requirements for DNA test results. See State v. Rowell, 517 So.2d 799 (La.1988); State v. Chauvin, 560 So.2d 920 (La.App. 1 Cir.1990). See also LSA-R.S. 32:663.
Regarding the defendant's contention that a proper foundation was not established for Montgomery to testify about DNA statistics, LSA-C.E. art. 703 states:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
LSA-C.E. art. 705(B) states, "In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible such basis shall only be elicited on cross-examination."
An expert witness may testify based on information obtained from others and the character of evidence upon which the expert bases an opinion affects only the weight to be afforded the expert's conclusion. State v. Fallon, 290 So.2d 273 (La.1974); State v. Austin, 282 So.2d 711 (La.1973). The expert witness testifying in court need not be the person who actually compiled the statistics for comparison. He or she may rely on data prepared by others. State v. Fallon, 290 So.2d at 291. The trial court did not err in allowing Montgomery to give her expert opinion about statistical information concerning the DNA test results basing her opinion on data prepared by others. The defense counsel's complaints go to the weight of Montgomery's testimony, not to its admissibility. See State v. Stelly, 94-306 (La.App. 3 Cir. 11/2/94); 645 So.2d 804, writ denied, 94-3103 (La. 4/28/95); 653 So.2d 589; State v. Brossette, 93-1036 (La.App. 3 Cir. 3/2/94); 634 So.2d 1309, writ denied, 94-0802 (La. 6/24/94); 640 So.2d 1344; State v. Wright, 593 So.2d 759 (La.App. 5 Cir.); writ denied, 599 So.2d 313 (La.1992), cert. denied, 506 U.S. 922, 113 S.Ct. 340, 121 L.Ed.2d 257 (1992). Assignments of error numbers 24 and 25 lack merit.

*56 TIMELINESS OF TRIAL

ASSIGNMENTS OF ERROR NUMBERS 29 AND 30
In assignment of error number 29, the defendant contends the court erred when, after a contradictory hearing, it denied his motion to quash wherein he contended the time limits for commencing trial expired. In assignment of error number 30, the defendant contends the court erred when it denied his motion for a speedy trial based on LSA-C.Cr.P. art. 701. The defendant did not brief assignment of error number 30 and, therefore, it is abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4. Concerning assignment of error number 29, we initially note that the defendant did not present any argument to support his contention beyond the bare assertion that the court erred and that nothing interrupted or suspended the time limits, nor did he cite any authority in support of his contention.
Under Article 578 of the Louisiana Code of Criminal Procedure, in pertinent part, "no trial shall be commenced: ... (2) In other felony cases after two years from the date of institution of prosecution." LSA-C.Cr.P. art. 580, concerning the interruption of the time limitation, states that:
[w]hen a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.
In this case, the defendant was indicted on August 30, 1993, and trial began on March 19, 1996, over two years from August 30, 1993. However, the defendant filed numerous preliminary pleas which served to suspend the time limitation, including a motion for change of venue, which was filed on September 15, 1993 and never ruled upon; a motion to suppress and a motion to traverse, which were filed on April 22, 1994, and decided on May 12, 1994, and June 9, 1994, respectively; and a motion to produce and for discovery, a motion for a bill of particulars, and a motion for a preliminary examination, which were filed on September 29, 1995, and set for hearing on December 7, 1995, although the record does not contain a ruling on these motions. Additionally, we note that "in no case shall the state have less than one year after the ruling to commence the trial." LSA-C.Cr.P. art. 580. We also note that under LSA-C.Cr.P. art. 579(A)(2), the period of limitation under article 578 is interrupted if "[t]he defendant cannot be tried ... for any other cause beyond the control of the state; ..." The minute entry for August 25, 1994, shows that the public defender, who was appointed to represent the defendant after the defense counsel moved to withdraw, moved to continue the trial, while the assistant district attorney stated that he was ready for trial. The court granted the public defender's motion, setting December 7, 1995, as the date the defendant was to receive notice of trial. For these reasons, the trial court did not err in denying the defendant's motion to quash and, therefore, assignment of error number 29 lacks merit.

SUFFICIENCY OF EVIDENCE

ASSIGNMENTS OF ERROR NUMBERS 31 AND 32
In assignment of error number 31, the defendant contends the court erred by denying his motion for post verdict judgment of acquittal; in assignment of error number 32, the defendant contends the court erred by denying his motion for new trial. We initially note that the defendant made an oral motion for new trial and an oral motion for post verdict judgment of acquittal which were denied, according to a minute entry. Thus, the defendant did not follow the requirement that the motion for new trial be in writing stating the grounds upon which it is based. LSA-C.Cr.P. art. 852. In brief, the defendant alleges the court should have granted his motions because the evidence was insufficient to support the conviction.
The defendant specifically contends that the evidence was insufficient because the state introduced no evidence of a weapon nor did it present any eyewitness testimony conclusively linking defendant to the crime. The defendant also argues that there is no *57 evidence from the crime scene itself connecting the defendant to the crime. The defendant alleges that there was no evidence that the blood found on the defendant's pants was actually that of the victim. The defendant argues that as far as the motive is concerned, if he wanted to murder the victim due to her filing charges against him, he was free for four or five months while the charges were pending, but did nothing to hurt the victim. Concerning the victim's watch which the defendant was alleged to possess after the murder, the defendant alleges that people bought and sold jewelry from the victim all the time. The defendant also argues that he cooperated with the police, giving them his jeans and voluntarily showing them the cuts on his hand, which he said were from hauling tin, and letting them draw blood. The defendant alleges that the state should have tested Eddie Prokop's blood. Regarding the DNA, the defendant contends that Montgomery indicated that 1 in 270 black individuals would also have the genetic information obtained from the foreign material found under the victim's left fingernail and that there could have been other combinations for the markers found in her test results, such that the marker combinations could have been representative of two entirely different people.
At the time of the offense, and presently, LSA-R.S. 14:30.1 provides, in pertinent part: "Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm; ..." The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the state proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821; State v. Maize, 94-0736 at p. 25, 655 So.2d at 516.
We find the state produced sufficient evidence of the defendant's guilt. At the trial, the state proved that the person who murdered the victim had the specific intent to kill with the testimony of Dr. Laga that there was an attempt to cut deeper into the victim's neck, where the slash wound the victim sustained cut her throat and esophagus and would have resulted in her death in at most five minutes; additionally, the victim sustained a potentially fatal stab wound to her abdomen. DNA under the victim's left fingernail was consistent with the defendant's DNA. When detectives saw the defendant the day after the murder, he had two cuts on his left hand. Although the defendant testified he received these cuts from hauling tin for Paul Denham, Denham told detectives he disagreed. The jeans the defendant was wearing the day of the murder had blood and mud on them. While the forensic scientist could not testify that the blood was the victim's blood, she did testify that the blood was determined to be consistent with the victim's blood. Mud was also found on the victim and on her bed where she was killed, although there was no mud around her house. A friend of the defendant's, Bridges, testified that on the day after the murder, he saw the defendant wearing a watch like the one the victim usually wore; the victim's brother had seen her wearing the watch on the night she was killed, and it was missing after she was killed. Bridges also testified that, when he asked the defendant if he could buy the watch, the defendant told him he was going to keep it in memory of the victim, then grinned and walked off. Another friend of the defendant, Jackson, testified that the defendant told him he had killed the victim but that "they" could not prove it. Jackson also testified that the morning after the victim was murdered, the defendant used some money which had blood on it at a store. One of the knives introduced into evidence was found in the defendant's house beneath a mattress. While the defendant did cooperate with the detectives, when he offered to give them the jeans he was wearing the night of the murder, they were found in a laundry basket, and his mother tried to say that the clothes he was wearing when interviewed by the detectives were what he had worn. The state also investigated Eddie Prokop and found no mud or blood on his jeans, in his car, or on the knife which was in his car. The state also proved the defendant had a motive to kill the victim; that is, she filed charges against him arising out of a matter for which he had been found not guilty, and *58 she was keeping a tiller which he thought belonged to him.
As the trier of fact, the jury was free to accept or reject, in whole or in part, the testimony of any witness. State v. Maize, 94-0736 at p. 26, 655 So.2d at 516. Furthermore, where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Maize, 94-0736 at p. 26, 655 So.2d at 516. The guilty verdict returned herein clearly indicated the jury accepted the testimony of the state's witnesses and rejected the defense theory of the case. On appeal, this court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Maize, 94-0736 at p. 26, 655 So.2d at 516.
After a careful review of the record, we are convinced that a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact finder can, could have concluded the state proved beyond a reasonable doubt that the defendant was guilty of second degree murder. Accordingly, the trial court did not err in denying the defendant's motion for post-verdict judgment of acquittal and motion for new trial. These assignments of error are meritless.

MOTION TO SUPPRESS

ASSIGNMENT OF ERROR NUMBER 28
In assignment of error number 28, the defendant contends the court erred when, after a contradictory hearing, it denied the defendant's motion to suppress. The defendant did not brief assignment of error number 28 and, therefore, it is abandoned. Uniform Rules, Courts of Appeal, Rule 2-12.4.

PATENT ERROR
Under the authority of LSA-C.Cr.P. art. 920(2), this court routinely reviews appellate records for patent error. After reviewing the record, we have discovered patent sentencing error caused by the trial court's failure to give the defendant credit for time served. See LSA-C.Cr.P. art. 880. The minute entry does not reflect that the defendant was given such credit, and the record does not contain the sentencing transcript; the commitment order does not reflect credit for time served. Accordingly, we amend the sentence to reflect that the defendant is to be given credit for time served prior to execution of the sentence. See State v. Greer, 572 So.2d 1166 (La.App. 1 Cir.1990). While we are aware that this sentence is for life without benefit of parole, probation, or suspension of sentence, we note and correct the failure to give credit for time served because this failure could make a difference if this sentence is ever considered for commutation and, if a decision is made to commute the sentence, the failure could also make a difference as to when the commutation should take effect. State v. King, 604 So.2d 661 (La.App. 1 Cir.1992).
Resentencing is not required. However, we remand the case and order the trial court to amend the commitment and the minute entry of the sentencing to reflect that defendant is to be given credit for time served on the sentence.
For the foregoing reasons, the defendant's assignments of error lack merit. Accordingly, the defendant's conviction and sentence are affirmed.
CONVICTION AFFIRMED; SENTENCE AFFIRMED AS AMENDED; AND REMANDED WITH ORDER.
FOIL, J., concurs in the result.
NOTES
[1] The record does not contain any assignments of error. The assignments of error are taken from the defendant's brief. Although the defense counsel did not properly designate assignments of error as required by articles 844, 916(1), 916(5), and 920 of the Louisiana Code of Criminal Procedure for the issues to be properly before this court, this court is bound to review the errors assigned and argued in his brief in accordance with the supreme court's ruling in State v. Galliano, 94-2030, 94-2280 (La. 1/6/95); 648 So.2d 911. See State v. Galliano, 93-1101, p. 6 n. 1 (La.App. 1 Cir. 5/5/95); 655 So.2d 538, 542 n. 1.
[2] The record shows that the defense counsel noted his objection to the court's failure to sustain his challenge for cause of Allen after the entire jury panel was sworn; however, the challenges to the second panel of jurors, which included Allen, were apparently exercised in an "[o]ff record discussion." While the defense counsel's objection may not have been timely under LSA-C.Cr.P. art. 800(A), it is without merit, as will be discussed herein.
[3] LSA-C.Cr.P. art. 770 states, in pertinent part:

Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
[4] LSA-C.Cr.P. art. 771 states, in pertinent part:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; ...
[5] The court did not specifically rule that the defendant had established a prima facie case of discrimination. The challenges were exercised off of the record in a bench conference and afterwards, the defense counsel commented that the state exercised a peremptory challenge to excuse Joseph. In ruling on the defendant's Batson challenge, the court stated, "I think the State had fairly good grounds to excuse ... Ms. Joseph. She knew a number of the people involved in it. She knew a number of the witnesses and I am going to deny the motion." The defense counsel then stated that he wanted the record to note that the State had not articulated any reasons for the dismissal of Joseph, either at the bench or for the record. However, the prosecutor stated that the state had enunciated reasons, at which time, the defense counsel apologized and withdrew his remark.
[6] Based on the defendant's 1990 census showing that six percent of the population was black, complete representation as to the seventy-eight prospective jurors would be five black jurors. Additionally, we note that insofar as the actual jury is concerned, the inclusion of two black jurors exceeds six percent.
[7] According to State v. McKinney, 174 La. 214, 140 So. 27 (La.1932), article 395 of the 1928 Louisiana Code of Criminal Procedure stated, In reaching a verdict the jurors must rely upon their memories, and they shall not be allowed, when they retire from the court room, access to any written evidence or to any notes of the testimony of any witness, but they may take with them when they retire to deliberate, any object or document received in evidence that requires a physical examination to enable them to arrive at a just conclusion.