STATE OF LOUISIANA
v.
ROBERT JOSEPH LEAGEA.
No. 2007 KA 1142.
Court of Appeal of Louisiana, First Circuit
November 2, 2007.
NOT DESIGNATED FOR PUBLICATION.
DOUG MOREAU, District Attorney, STEPHEN N. PUGH, KORY J. TAUZIN Assistant District Attorneys, Counsel for Appellee, State of Louisiana.
OTHA CURTIS NELSON, Sr., OTHA CURTIS NELSON, Jr., Counsel for Defendant/Appellant Robert Joseph Leagea.
Before: GAIDRY, McDONALD, AND McCLENDON, JJ.
GAIDRY, J.
The defendant, Robert Joseph Leagea,[1] was charged by bill of information with attempted aggravated rape (count 1), a violation of La. R.S. 14:42 and 14:27, and false imprisonment with a dangerous weapon (count 2), a violation of La. R.S. 14:46.1. He pleaded not guilty and waived trial by jury. Following a bench trial, defendant was acquitted on count 1 and convicted as charged on count 2. Defendant was subsequently sentenced to imprisonment at hard labor for two years. He now appeals, urging two assignments of error, challenging the sufficiency of the state's evidence for the false imprisonment conviction and the trial court's ruling on his motion for a new trial. Finding no merit in the assigned errors, we affirm the conviction and sentence.

FACTS
On May 5, 2006, Joshua Irving and Linda Irving received a telephone call from their twenty-three-year-old daughter, Tamara Irving. Tamara was a crack cocaine addict. In the past, she routinely telephoned her parents to pick her up from various drug houses after she had exhausted all of her money and drugs. On this occasion, however, Tamara's call involved more than a request for a ride home. Tamara told her parents that she was being held against her will at a residence on 48th Street in Baton Rouge and was afraid for her life. Joshua Irving immediately contacted the police.
Baton Rouge City Police Officer Michael C. Russo was dispatched to defendant's residence at 1134 North 48th Street to investigate the complaint. When Officer Russo arrived at the residence, he saw Tamara sitting in the living room. The inner door to the residence was opened, but the outer burglar bar door was closed. Officer Russo was unsure if the burglar bar door was locked. Once Tamara observed Officer Russo at the door, she ran through the door, grabbed Officer Russo, and stated repeatedly, "(H)e wouldn't let me leave." Tamara claimed she had been held captive by defendant for over twelve hours. She also claimed that defendant attempted to rape her. Defendant was arrested. Tamara was transported to the police station for further questioning.
Tamara told the police that she had entered defendant's residence to use the telephone to contact her parents. She did not know defendant before then. She claimed she had been walking down the street, after having been kicked out of a house by her ex-boyfriend, when she saw defendant and several other men sitting outside. She asked the men for permission to use the telephone. Defendant agreed to let her use the telephone and allowed her to enter his residence. However, once she was inside, defendant refused her access to the telephone and did not let her leave. He brandished two knives that he referred to as "the twins," and told Tamara she was "not going anywhere." Defendant also told Tamara that he was a "cold blooded murderer" and would use "the twins" on her if she attempted to flee.

FIRST ASSIGNMENT OF ERROR: SUFFICIENCY OF THE EVIDENCE
In his first assignment of error, defendant contends the trial court erred in convicting him of the false imprisonment of the victim. Specifically, defendant contends that he never held Tamara against her will and that she was always free to leave his residence. Louisiana Revised Statutes 14:46.1(A) defines "[f]alse imprisonment while armed with a dangerous weapon" as "the unlawful intentional confinement or detention of another while the offender is armed with a dangerous weapon."
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See also La. C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988).
At the trial of this matter, Tamara described the events that led to her being held against her will in defendant's home. She stated that on May 4, 2006, she was living with her parents in their home in Baker, Louisiana. She was attempting to recover from her drug addiction with her parents' assistance. During the day, her father had driven her to a drug rehabilitation counseling clinic. She failed to return home after her meeting. Instead, she was picked up by Shawn Hill, her ex-boyfriend. According to Tamara, Shawn Hill was a drug dealer. He took Tamara to a drug house on North 48th Street and provided crack cocaine for her use that night. Tamara claimed she used crack cocaine all night. Early the next morning, May 5, 2006, after she had exhausted all of her funds, Shawn Hill put Tamara out of the house. Tamara claimed she then proceeded to look for a pay telephone to call her parents. She was walking down 48th Street, at approximately 6:00 a.m., when she saw the defendant and two other men sitting outside. Tamara claimed that, although she did not know any of the men, she asked if she could use the telephone. Defendant said he would allow her to do so.
According to Tamara, she followed defendant into his residence. As she attempted to use the telephone, defendant tried to kiss her. Tamara resisted defendant's advances and told him that she only wanted to use the telephone. Defendant told her to wait for a minute and he would allow her to do so. Defendant went back outside, and Tamara sat on the sofa awaiting permission to use the telephone. When defendant returned, he closed the door behind him. He told Tamara that she was too pretty to be using drugs. He stated, "I could fall in love with you . . . [Y]ou are not going anywhere." Tamara claimed she insisted that she be allowed to call her parents and to leave the residence. At this point, defendant told Tamara "let me introduce you to the twins." He then retrieved two long, red folding knives from beneath a pillow on the sofa. Defendant claimed that he was a "cold[-] blooded murderer" and showed her a home incarceration ankle bracelet.[2] When Tamara asked defendant if he would kill her, he replied, "[I]n a heartbeat[,] no questions asked." Tamara testified that she feared for her life.
Tamara claimed that defendant later led her into his bedroom, where he unbuttoned her pants and attempted to penetrate her vaginally with his penis. She claimed defendant also tried to force her to perform oral sex. The attempts to engage in sex were unsuccessful, however, because defendant could not obtain an erection. Tamara testified that the sexual attempts occurred twice during the day. She stated that during each encounter, she struggled to resist penetration. Each time, defendant advised Tamara that she was not leaving the residence until he got what he wanted, claiming that he had just been released from prison and he "wanted some."
Tamara claimed she eventually returned to the sofa and simply sat there. She explained that because she feared that defendant would harm her, she "didn't know what to do." Although defendant left the residence to walk outside several times, Tamara never attempted to escape, claiming that she was too afraid.
Later, defendant allowed Tamara to use the telephone after she told him that she needed to contact her employer to advise that she would not be at work that day. She instead contacted her parents and told them where she was, explaining that she needed help. After her parents reported the matter to the police, the 911 operator called defendant's residence and asked to speak to Tamara. Defendant allowed Tamara to take the call. The call was recorded and the recording played during the trial. During the call, Tamara again claimed that defendant would not allow her to leave his residence. At trial, Tamara explained that she did not leave defendant's residence until she saw the police because she did not feel "free" until then.
Tamara denied using any drugs at defendant's residence. However, she admitted that a crack pipe and lighter found on the table near the sofa belonged to her. She explained that she had removed those items from her pocket and placed them on the table because she did not need them anymore.
Officer Musso and Officer Hilton Riley, Jr. (also of the Baton Rouge Police Department) testified that Tamara was shaking hysterically and crying when she exited defendant's residence. She immediately advised them that she had been held at the residence against her will all day.
Detective Trey Walker of the Baton Rouge Police Department Sex Crimes Division testified that he spoke with defendant after his arrest. Defendant told Detective Walker that he had just met Tamara during the evening as she walked down the street. He invited her, and she voluntarily accompanied him, into his home. Defendant denied ever attempting to force Tamara to have sex, and claimed that she voluntarily performed oral sex upon him. He denied holding Tamara against her will. Defendant told Detective Walker that Tamara was always free to leave. He claimed that she "freaked out" after smoking some crack cocaine at his residence. Defendant admitted that he owned two knives and kept them under the pillow of his sofa. He also claimed that the knives were still beneath the pillow. However, the knives could not be found during a subsequent search of defendant's residence.
Joshua Irving, Tamara's father, testified on behalf of the state. He explained that he was well aware of Tamara's ongoing drug problem. He stated that Tamara was always honest with him regarding her drug use and would not have had reason to fabricate a story for him to pick her up.
Defendant presented an entirely different account of the events that transpired on the date in question. Through the testimony of numerous witnesses, defendant attempted to establish that Tamara was not at his house as long as she claimed, that she was always free to leave, and that he spent most of the day outside.
At the trial, despite having previously told the police that he met Tamara for the first time on the date in question, defendant testified that Tamara regularly visited his home seeking money in exchange for sex. Defendant claimed that he and Tamara had their first sexual encounter the day he met her, paying her ten dollars for sexual intercourse. Defendant claimed that on the date in question, at approximately 4:00 p.m., he was sitting outside with some friends when Tamara approached and sat on his lap. He claimed that he knew what Tamara wanted because "that's all she came for." Tamara obtained money from him and left. Approximately twenty minutes later, Tamara returned for more money. Defendant claimed he gave Tamara an additional ten dollars and she left again. On the third occasion she returned, defendant refused to give Tamara any more money. Defendant denied ever threatening or forcing Tamara to stay at his residence. He claimed that Tamara had smoked crack at the drug house and "freaked out."
On cross-examination, defendant admitted that he owned two folding knives. He further admitted that he referred to those two knives as "the twins."
The defense presented a host of other witnesses to establish that defendant was seen standing outside his residence at various times throughout the day.
As a trier of fact, the judge is free to accept or reject, in whole or in part, the testimony of any witness. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of weight of the evidence, not its sufficiency. On appeal, this court will not assess the credibility of the witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. State v. Pooler, 96-1794, p. 56 (La. App. 1st Cir. 5/9/97), 696 So.2d 22, 58, writ denied, 97-1470 (La. 11/14/97), 703 So.2d 1288. The appellate court is constitutionally precluded from acting as a thirteenth juror in assessing what weight to give evidence in criminal cases; this is within the discretion of the trier of fact. State v. Mitchell, 99-3342, p. 8 (La. 10/17/00), 772 So.2d 78, 83.
In the instant case, the trial court heard different accounts of the circumstances surrounding Tamara's visit to defendant's residence on the date in question. While Tamara claimed her life was threatened and she was held against her will, defendant claimed she was present voluntarily. The trial court, after carefully weighing the evidence, chose to accept the facts as presented by the state witnesses. In its reasons for judgment, the trial court specifically noted that despite inconsistencies on both sides, it found Tamara to be credible. The court concluded that there was absolutely no reason for Tamara to have fabricated a story of being held captive. Adding to Tamara's credibility was the fact that defendant admitted that he owned two knives that he referred to as "the twins." The court noted that there was no way for Tamara to know that fact if defendant had not, at some point, brandished the knives and told her about them.
After a careful review of the record, we find that the evidence supports the trial court's ruling. Having viewed all of the evidence in a light most favorable to the prosecution, a rational factfinder could have concluded, beyond a reasonable doubt, that defendant falsely imprisoned Tamara while armed with a dangerous weapon.
This assignment of error lacks merit.

SECOND ASSIGNMENT OF ERROR: DENIAL OF MOTION FOR A NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE
By this assignment of error, defendant contends the trial judge erred in denying his motion for a new trial despite new evidence that he did not hold Tamara against her will. In his motion, defendant alleged that a new trial was warranted because there were witnesses who would testify that Tamara was observed leaving his residence and returning to the drug house from which she came sometime between 4:00 and 6:00 p.m. According to defendant, these witnesses would affirm that Tamara also changed clothing at the drug house and voluntarily returned to defendant's residence shortly before the police arrived.
The motion for new trial is based upon the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded. La. C.Cr.P. art. 851. In order to obtain a new trial based on newly discovered evidence, the defendant has the burden of showing (1) the new evidence was discovered after trial, (2) the failure to discover the evidence at the time of trial was not caused by lack of diligence, (3) the evidence is material to the issues at trial, and (4) the evidence is of such a nature that it probably would have produced a different verdict. State v. Smith, 96-0961, p. 7 (La. App. 1st Cir. 6/20/97), 697 So.2d 39, 43. See also La. C.Cr.P. art. 851(3).
At the hearing on the motion for a new trial, Larry Quinn testified that he was outside his 48th Street residence washing cars on the day in question. Quinn testified that approximately one hour before the police arrived, he observed defendant standing outside. Shortly thereafter, he observed a young woman leave defendant's residence and go to a neighboring house reputed to be a location for drug sales. The young woman subsequently returned to defendant's residence wearing different clothing.
Kevin Knighten testified that he went to defendant's residence sometime around noon on the day in question. He and Joseph O'Conner later left to purchase beer for defendant and Tamara. According to Knighten, he and O'Conner visited with defendant inside his residence for approximately five minutes upon returning from the store. Knighten claimed to have observed Tamara sitting on the sofa watching television while defendant was in the kitchen. According to Mr. Knighten, Tamara did not then appear nervous, and was "laid back on the couch watching T.V."
Tonika Quinn, Larry Quinn's niece, testified that she lived at the residence on 48th Street reputed to be a location for drug trafficking. She and Shawn Hill, Tamara's ex-boyfriend, were romantically involved. Tonika denied that Shawn Hill ever brought a woman to that residence. Tonika indicated that she often kept extra clothing at the residence for individuals who might have needed it. When asked if she knew Tamara, Tonika admitted that she may have. She further testified regarding a young lady she referred to as "Bowdy," who routinely visited the residence for crack cocaine, but did not positively identify Tamara as "Bowdy." Tonika was unable to add anything further as to what transpired between defendant and Tamara on the day in question.
At the conclusion of the hearing, the trial court denied the motion for a new trial specifically finding that the evidence sought to be introduced was not new, was not credible, and would not have changed its previous credibility determinations and assessment of the evidence presented during the trial.
After a careful review of the record, we find no abuse of discretion in the trial court's denial of defendant's motion for a new trial based upon newly discovered evidence. First, we note that the evidence alleged in the motion was not "new" evidence. The record reflects that defendant was aware of the substance of Larry Quinn's testimony prior to the trial. In fact, defendant had previously subpoenaed Mr. Quinn to testify at trial. While the evidence presented, if believed, may have been relevant to defendant's defense, defendant failed to show that, notwithstanding the exercise of reasonable diligence, the evidence was not discoverable before or during the trial. A motion for new trial is properly rejected when it is based on evidence which should have, with reasonable diligence, been discovered before or during trial. State v. Brooks, 01-1138, p. 14 (La. App. 1st Cir. 3/28/02), 814 So.2d 72, 82, writ denied, 02-1215 (La. 11/22/02), 829 So.2d 1037. The newly discovered whereabouts or residence of a known witness is not newly discovered evidence. La. C.Cr.P. art. 854.
Furthermore, even if we were to find that the evidence was newly discovered, defendant failed to establish that the evidence was of such a nature that it would probably have produced a different verdict at a retrial. Defendant did not sustain his burden of showing that the uncorroborated testimony of defendant's neighbor, Mr. Quinn, whose credibility was questionable, would have resulted in the trial judge finding the victim's account of the events to be less credible.
Insofar as the testimony of Kevin Knighten is concerned, we find no error or abuse of discretion in the trial court's finding that Knighten's testimony (which clearly contradicted defendant's own trial testimony and the testimony of defense witness Joseph O'Conner) would not have resulted in a different verdict. At the hearing, Knighten testified that when he and O'Conner returned to defendant's residence with the beer they purchased for him, they both went inside the residence and stayed awhile. However, defendant and O'Conner had previously testified at trial that Knighten and O'Conner simply handed the beer through the door and left without entering.
Contrary to defendant's claims that the alleged "newly discovered evidence" warranted a new trial, the trial court, who sat as the trier of fact in this case, heard the evidence on the motion for a new trial and specifically concluded that the evidence, if presented at the trial, would not have changed its verdict. The trial court's denial of a motion for new trial will not be disturbed absent a clear abuse of discretion. State v. Maize, 94-0736, pp. 27-28 (La. App. 1st Cir. 5/5/95), 655 So.2d 500, 517, writ denied, 95-1894 (La. 12/15/95), 664 So.2d 451. Considering all of the evidence presented, and taking into consideration the trial court's express credibility determinations and the contradictions between the "new evidence" and the testimony presented at trial, it was not shown that an injustice resulted from denial of defendant's request for a new trial.
This assignment of error also lacks merit.

REVIEW FOR ERROR
In his brief, defendant also asks that this court examine the record for error under La. C.Cr.P. art. 920(2). We routinely review the record for such error, whether or not such a request is made by a defendant. Under La. C.Cr.P. art. 920(2), we are limited in our review to errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence. After a careful review of the record in these proceedings, we find no reversible errors. See State v. Price, 05-2514, pp. 18-22 (La. App. 1st Cir. 12/28/06), 952 So.2d 112, 123-125 (en banc).
Accordingly, the conviction and sentence of the defendant, Robert Joseph Leagea, are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] Defendant's surname was alternatively spelled "Leagea" or "Legea" in the pleadings and other documents filed in the trial court, and was not always consistently spelled within the same document or even defendant's own brief in this court. Based upon our review of the record and the signatures of defendant and his sister on affidavits, it appears that defendant's surname is actually "Leagea," and we have adopted that spelling herein.
[2] Defendant was on home incarceration in connection with a previous conviction for driving while intoxicated.